J-A07009-17

2017 PA Super 261

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOHN YOCOLANO, | |
| Appellant | No. 808 WDA 2015 |

Appeal from the Judgment of Sentence April 21, 2015
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0003175-2012

BEFORE:  OLSON, STABILE and STRASSBURGER,* JJ.

OPINION BY OLSON, J.                    **FILED AUGUST 14, 2017**

Appellant, John Yocolano, appeals from the judgment of sentence entered on April 21, 2015, following his jury trial convictions for three counts of indecent assault, two counts of sexual assault, and one count each of rape, kidnapping, involuntary deviate sexual intercourse (IDSI), aggravated assault, simple assault, unlawful restraint, terroristic threats, and false imprisonment.[1]  Upon careful consideration, we are constrained to vacate the judgment of sentence and remand for a new trial.

We summarize the facts as presented at trial as follows.  A.A. and Appellant had a tumultuous romantic relationship over the course of several years.  In 2010, A.A. and Appellant lived together.  On December 19, 2010,

_____

[1]  18 Pa.C.S.A. §§ 3121, 2901, 3123, 2702, 2701, 2902, 2906, and 2903, respectively.

*Retired Senior Judge assigned to the Superior Court.

police responded to a call stating that Appellant had an altercation with A.A. wherein Appellant kicked in an exterior door, breaking the lock and then chased A.A. around her father's house. A.A. ended her relationship with Appellant, but then resumed it several months later.

In December 2011, Appellant and A.A. moved in to an apartment together after A.A. found out that she was pregnant. On March 13, 2012, Appellant threatened A.A. with a machete during a verbal altercation. Police responded to the scene, but no criminal charges were filed. Appellant and A.A. continued living together and their son was born in May 2012.

On July 16, 2012, A.A. called the police in response to another argument, but after the altercation, she continued living with Appellant. On July 27, 2012, police responded to an emergency call from A.A. claiming that Appellant expressed suicidal thoughts and left the residence following an argument between the parties.

In August 2012, the parties became engaged to be married. On September 1, 2012, A.A. filed a police report claiming Appellant threatened and choked her. Police recommended that A.A. file a petition for Protection from Abuse (PFA), but she did not. On September 19, 2012, Appellant punched A.A. in the head and stomach and threatened to kill her and her family. On September 21, 2012, police responded to a call from Appellant wherein he claimed A.A. and their child were missing for two days. Upon investigation, police found A.A. at her father's house along with the couple's child. On October 4, 2012, A.A. obtained a final PFA against Appellant. In

November 2012, the parties again attempted reconciliation, but A.A. and the couple's child moved in with another man.

In December 2012, A.A. filed a petition to withdraw the PFA against Appellant and a hearing was scheduled in January 2013. When A.A. relayed this information to Appellant, he became angry. At the time, the parties' son was in Appellant's custody and he told A.A. to retrieve the child. A.A. testified that when she arrived at Appellant's residence, he lured her inside, locked the door, punched her in the face, and began strangling her. A.A. stated that Appellant carried her to the bedroom where he tied her wrists and ankles with an electrical cord and forcibly removed her clothes. Over the next few hours, Appellant removed and retied the bindings several times while forcing multiple acts of vaginal and oral intercourse on A.A. Following the assault, Appellant instructed A.A. to shower. When A.A.'s friend came to Appellant's residence to inquire about her whereabouts, A.A. escaped and went directly to local police to report the incident. She was taken by ambulance to the hospital where medical staff documented bruises to A.A.'s neck, face, ankles, and wrists. A rape examination kit was performed which revealed the presence of Appellant's semen and DNA.[2] Appellant was

_____

[2] Appellant concedes that he engaged in sexual acts with A.A., but claims it was consensual.

arrested and the Commonwealth filed a criminal information against Appellant charging him with the aforementioned offenses.

Prior to and during trial, the trial court ruled on several evidentiary matters that are the subject of this appeal. On November 7, 2014, the Commonwealth filed a motion *in limine* to exclude the report and testimony of Appellant's proffered expert, Cyril H. Wecht, M.D., who opined about the cause and manner of A.A.'s injuries.[3] The Commonwealth's motion claimed that Appellant did not establish that Dr. Wecht qualified as an expert. Moreover, the Commonwealth maintained that Dr. Wecht's report was inadmissible because it offered an opinion on A.A.'s credibility.[4] **See** Commonwealth's Motion *in Limine* to Exclude Defendant's Report and Testimony, 11/7/2014, at ¶ 8; **id.** at Exhibit 1. The trial court held a hearing on the admissibility of Dr. Wecht's report on December 1, 2014. By order entered on December 2, 2014, the trial court granted the Commonwealth's request to preclude Dr. Wecht's report and testimony, concluding "the proposed expert testimony is not necessary to explain injury

---

[3] Dr. Wecht determined that the documented injuries were inconsistent with A.A.'s account of events. His report stated that he "would have expected significantly more evidence of such violent, physically traumatic, deliberately inflicted injuries to be present." **See** Commonwealth's Motion *in Limine* to Exclude Defendant's Report and Testimony, 11/7/2014, Exhibit 1, at 4.

[4] Dr. Wecht's report states, "the relative superficiality and paucity of physical injuries documented at the hospital raises serious doubts about [A.A.'s] account." **See** Commonwealth's Motion *in Limine* to Exclude Defendant's Report and Testimony, 11/7/2014, Exhibit 1, at 4.

or lack of injury and that the proposed testimony would invade the province of the jury regarding [A.A.'s] credibility."[5]  Order, 12/2/2014, (unpaginated) at 1.

On December 18, 2014, the Commonwealth filed a notice of intent to permit the use of prior bad acts evidence pursuant to Pa.R.E. 404(b).  The Commonwealth sought to use three police reports related to the March 13, 2012, September 1, 2012, and September 21, 2012 incidents, as detailed above.  On December 19, 2014, the Commonwealth filed an amended notice of intent to permit the use of additional prior bad acts evidence.  Therein, the Commonwealth sought to use two police reports related to the July 16, 2012 and July 27, 2012 incidents, as set forth previously.  The Commonwealth also filed a motion *in limine* to support the admission of evidence relating to the episodes of domestic abuse as prior bad acts under Rule 404(b).  Following argument, the trial court entered an order on December 24, 2014, granting the Commonwealth's request to use the prior bad acts evidence.  On January 2, 2015, the Commonwealth filed a second amended notice of intent to use prior bad acts.  In that filing, the Commonwealth sought to introduce the police report from the December 2010 incident wherein police responded to a call that Appellant chased A.A.

_____

[5]  As discussed later, on appeal, Appellant does not specifically challenge the trial court's order precluding Appellant from calling Dr. Wecht as an expert witness.  ***See infra*** at 22, n.9.

after kicking open her father's front door. The Commonwealth also sought to use the October 2012 PFA filed by A.A. against Appellant. The trial court never entered a new order, or amended its December 24, 2014 order, to include the prior bad acts presented in the Commonwealth's second amended Rule 404(b) notice.

A jury trial commenced on January 12, 2015. After A.A. testified, Appellant sought leave to recall her and ask about three statements posted to her Facebook account in the weeks following the incident at issue. The trial court denied Appellant relief. On the fourth day of trial, the Commonwealth sought to use two additional unrelated PFAs (filed against Appellant by women other than A.A.) which the prosecution claimed it had just discovered. The trial court ruled that the Commonwealth could only use these PFAs on cross-examination if Appellant testified. Appellant, however, did not testify. At the conclusion of trial, the jury convicted Appellant of all charges. On April 21, 2015, the trial court sentenced Appellant to an aggregate sentence of 18 to 36 years of imprisonment. This timely appeal resulted.[6]

_____

[6] On May 18, 2015, Appellant filed a notice of appeal. On June 15, 2015, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely. On August 27, 2015, however, Appellant presented a motion for leave to supplement his Rule 1925(b) statement as defense counsel had not yet received transcripts of the jury charge. The trial court granted Appellant an additional 21 days following the receipt of the transcript to supplement his Rule 1925(b) statement. Appellant filed a revised Rule 1925(b)
*(Footnote Continued Next Page)*

On appeal, Appellant presents the following issues[7] for our review:

1. Did the trial judge commit an abuse of discretion by denying [] Appellant his right to rebut the Commonwealth's 404(b)/prior bad act evidence?

2. Did the trial judge commit an abuse of discretion by prohibiting Appellant from re-calling [A.A.] upon the discovery of new evidence, mid-trial, which demonstrated clear motive to lie and which squarely supported [] Appellant's defense?

3. Did the trial judge commit an abuse of discretion by permitting a Commonwealth lay witness to testify to expert opinions [] in clear violation of Pennsylvania Rule of Evidence 701(c)?

4. Did the trial judge commit an abuse of discretion by permitting the Commonwealth's use of two [PFAs] involving other individuals which were produced to the defense for the first time on the 4th day of a 5 day trial – which prevented [] Appellant from testifying in his own defense?

5. Did the cumulative effect of all the errors on evidentiary rulings deprive Appellant of a fair trial?

Appellant's Brief at 6-7.

_____
*(Footnote Continued)* —————————

statement on November 9, 2015. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on April 13, 2016.

[7] While Appellant presented 19 issues for the trial court's review, he only presents five issues on appeal to this Court. Appellant has abandoned the other fourteen issues by failing to provide any discussion of the claims with citation to relevant authority, and, thus, we consider them waived. *See* ***Commonwealth v. Johnson***, 985 A.2d 915, 924 (Pa. 2009) (citation omitted) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

All of Appellant's issues challenge evidentiary rulings by the trial court. Thus, our standard of review is as follows:

The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

In the event of an erroneous admission of evidence, a verdict can still be sustained if the error was harmless. An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction. [Our Supreme Court has] found harmless error where:

(1)    the error did not prejudice the defendant or the prejudice was *de minimis;*

(2)    the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or

(3)    the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

The Commonwealth has the burden of proving harmless error beyond a reasonable doubt.

***Commonwealth v. Poplawski***, 130 A.3d 697, 716 (Pa. 2015) (internal citations and quotations omitted).

In his first issue presented, Appellant claims that the trial court wrongly prohibited him from refuting or rebutting the Commonwealth's presentation of Rule 404(b) prior bad acts evidence. Appellant's Brief at 19-20. More specifically, Appellant claims that the trial court erroneously barred him from calling witnesses to rebut A.A.'s account of the December 2010 incident wherein police responded to a call that Appellant chased A.A. after breaking down her father's front door. *Id.* Appellant also argues that the trial court erroneously denied relief when Appellant "offered to call three neighbors who lived in the small apartment complex to testify that they saw [and] heard nothing" to refute A.A.'s claim "that Appellant administered prior beatings to [A.A.] in their apartment and that she would scream for help." *Id.* at 11. Appellant claims that the trial court allowed the Commonwealth to present Rule 404(b) evidence of past incidents of domestic violence between A.A. and Appellant, ruling that the testimony was probative of the crimes charged. In contrast, the trial court prohibited Appellant's attempts to rebut the accuracy, extent or severity of the episodes, concluding that such rebuttal testimony was collateral. *Id.* at 9-10. Appellant argues that the same standard should apply to both parties – if episodic prior bad acts evidence is relevant, then evidence relating to the same episodes that rebuts an opponent's proof is also relevant; if the prior bad acts evidence is collateral, then rebuttal evidence would likewise be collateral. *Id.* at 20. Appellant thus claims that the trial court abused its

discretion by precluding rebuttal witnesses who were prepared to testify that A.A. fabricated her assertions of past abuse by Appellant. *Id.* at 10-11.

Pennsylvania Rule of Evidence 404(b), pertaining to prior bad acts evidence, provides, in pertinent part:

\*      \*      \*

**(b) Crimes, Wrongs or Other Acts.**

(1)     *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2)     *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

(3)     *Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

This Court recently determined:

Evidence of a defendant's distinct crimes are not *generally* admissible against a defendant solely to show his bad character or his propensity for committing criminal acts, as proof of the commission of one offense is not *generally* proof of the commission of another. However, this general proscription against admission of a defendant's distinct bad acts is subject to numerous exceptions if the evidence is relevant for some

legitimate evidentiary reason and not merely to prejudice the defendant by showing him to be a person of bad character.

Exceptions that have been recognized as legitimate bases for admitting evidence of a defendant's distinct crimes include, but are not limited to:

(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design such that proof of one crime naturally tends to prove the others; (5) to establish the identity of the accused where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other; (6) to impeach the credibility of a defendant who testifies in his trial; (7) situations where defendant's prior criminal history had been used by him to threaten or intimidate the victim; (8) situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development (sometimes called "*res gestae*" exception).

Additional exceptions are recognized when the probative value of the evidence outweighs the potential prejudice to the trier of fact.

*Commonwealth v. Hicks*, 151 A.3d 216, 225 (Pa. Super. 2016) (emphasis

in original).

We previously noted:

Our Supreme Court has consistently recognized that admission of distinct crimes may be proper where it is part of the history or natural development of the case, *i.e.,* the *res gestae* exception.

[…O]ur Supreme Court explained,

the *res gestae* exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, *i.e.*, evidence of other criminal acts is admissible to complete the story of

- 11 -

the crime on trial by proving its immediate context of happenings near in time and place.

Where the *res gestae* exception is applicable, the trial court must balance the probative value of such evidence against its prejudicial impact. In conducting this balancing test,

courts must consider factors such as the strength of the other crimes evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

***Commonwealth v. Brown***, 52 A.3d 320, 325–327 (Pa. Super. 2012) (internal citations and quotations omitted). "Our Supreme Court has stated that PFA petitions are admissible and relevant to demonstrate the continual nature of abuse and to show the defendant's motive, malice, intent, and ill-will toward the victim." ***Commonwealth v. Ivy***, 146 A.3d 241, 251 (Pa. Super. 2016), *citing* ***Commonwealth v. Drumheller***, 808 A.2d 893, 905 (Pa. 2002).

Upon review, we discern no abuse of discretion in allowing evidence of A.A.'s and Appellant's relationship, including the PFA issued in favor of A.A. and against Appellant. The trial court determined that the incident at issue logically grew out of the prior set of circumstances, proof of which was necessary to explain the complete story. It balanced the probative value of the evidence against its prejudice. We discern no abuse of discretion.

However, Appellant further argues that the trial court then abused its discretion by precluding him from calling various witnesses to rebut A.A.'s

prior bad acts testimony pertaining to the parties' acrimonious relationship on the basis that such testimony would be collateral. The trial court relied upon Pennsylvania Rule of Evidence 607, which sets forth the scope of impeaching witnesses. Trial Court Opinion, 4/13/2016, at 28-30. Rule 607 provides, "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, except as provided by statute or these rules." Pa.R.E. 607. The trial court also cited our Supreme Court's 1941 decision in **Commonwealth v. Petrillo**, 19 A.2d 288 (Pa. 1941) for the proposition that "[n]o witness can be contradicted on everything he testifies to" or on collateral matters "which ha[ve] no relationship to the case on trial." Trial Court Opinion, 4/13/2016, at 29-30, *citing* **Petrillo**, 19 A.2d at 295. In this case, the trial court limited rebuttal testimony to "allow the neighbors to testify regarding what they saw and heard the night of December 6, 2012[, the date of the alleged assault *sub judice*]." Trial Court Opinion, 4/13/2016, at 30. The trial court, however, precluded Appellant from calling witnesses to refute A.A.'s version of events regarding specific episodes that occurred during the parties' relationship. It reasoned that none of the proffered witnesses "offered any evidence to contradict [] the events of December 6, 2012, [since] they only offered impeachment evidence on collateral matters, and as such, their testimony was not admissible." **Id.**

The trial court abused its discretion in precluding Appellant's proffered rebuttal witnesses to refute A.A.'s testimony regarding the parties'

relationship under the *res gestae* exception. First, as set forth above, in the absence of an applicable exception, prior bad acts evidence is generally collateral and not admissible to prove the commission of the alleged crimes at issue. *See Hicks*, 151 A.3d at 225. Here, the trial court determined that the *res gestae* evidence was relevant and material to the case under an exception to the general prohibition of prior bad acts evidence. Once the trial court found the evidence was material to explain the complete story, it follows that Appellant should have been permitted to test the veracity of A.A.'s version of events. As our Supreme Court concluded:

> the admission of rebuttal testimony is within the sound discretion of the trial court, and the appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut. Where the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered.

*Commonwealth v. Ballard*, 80 A.3d 380, 401–402 (Pa. 2013) (internal citations and quotations omitted). Accordingly, when the Commonwealth offered evidence of Appellant's prior bad acts against A.A., the scope of Appellant's rebuttal was limited only by A.A.'s testimony in that regard. Thus, we conclude that the trial court abused its discretion by precluding Appellant from calling witnesses to test A.A.'s credibility in describing Appellant's prior bad acts.

Because Appellant's fourth issue also pertains to Rule 404(b) evidence, we will examine that issue next. Appellant claims that the trial court abused

its discretion by permitting the Commonwealth to admit two unrelated PFAs (involving women other than A.A.) that the Commonwealth produced for the first time on the fourth day of trial. Appellant's Brief at 29-30. Appellant contends that the Commonwealth failed to show good cause in offering these PFAs mid-trial, when the case had been pending for over two years, and therefore, was in violation of Rule 404(b)'s notice requirement. According to Appellant, this violation caused him unfair surprise and prejudice. *Id.* Hence, Appellant claims "[i]t was too great a risk [] to testify in light of the [trial c]ourt's ruling that he could be cross[-examined] on the two unrelated PFAs if he 'opened the door.'" *Id.* at 30.

Rule 404(b)(3) provides: "In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial." Pa.R.E. 404(b)(3) (emphasis added). Therefore, the Rule allows the court to excuse pretrial notice for "good cause," but does not define it. We previously noted that with regard to notice, "good cause" is defined generally as a

> substantial reason, one that affords a legal excuse. Legally sufficient ground or reason. Phrase "good cause" depends upon circumstances of [an] individual case, and finding of its existence lies largely in [the] discretion of [an] officer or court to which [the] decision is committed.... "Good cause" is a relative and highly abstract term, and its meaning must be determined not only by verbal context of statute in which term is employed but also by context of action and procedures involved in type of case presented.

- 15 -

***Anderson v. Centennial Homes, Inc.***, 594 A.2d 737, 739 (Pa. Super. 1991) (emphasis omitted), *citing* Black's Law Dictionary 623 (5th ed. 1979).

> Here, the trial court found
>
> that the Commonwealth demonstrated good cause for not providing [] notice [of the unrelated PFAs], *i.e.* that it was not aware of the evidence prior to the time of disclosure.
>
> [..T]he PFA orders did not come to the Commonwealth's attention until during the trial. Obviously, [Appellant] was aware of these orders without the Commonwealth's assistance and could have informed his defense counsel of their existence. Therefore, the evidence would have been proper to allow on cross[-]examination [of Appellant], although it was ultimately not introduced because [Appellant] did not testify.

Trial Court Opinion, 4/13/2016, at 25 (footnote omitted).

We believe that the trial court abused its discretion in this regard. Upon review of the record, the Commonwealth simply did not explain the reason for the late discovery of the third-party PFAs and, therefore, did not proffer a good cause. As the Commonwealth acknowledged, the third-party PFAs were "accessible to anyone that care[d] to look for them." N.T., 1/15/2015, at 1090. Thus, the Commonwealth's contention that it "just had [the third-party PFAs] pulled from the [c]ourt system" mid-trial, when it "just took a gander and punched [Appellant's] name in" simply does not qualify as a valid legal excuse. The Commonwealth could have discovered the third-party PFAs through due diligence prior to trial and given Appellant

proper notice to prepare his defense.[8]  Hence, we conclude that the trial court abused its discretion in finding good cause for the Commonwealth's delayed disclosure.

Moreover, in addition to the Commonwealth's failure to provide proper notice of the third-party PFAs, we have concerns about whether those PFAs met the substantive requirements of Rule 404(b).  In *Ivy*, while we specifically held that third-party PFAs could be entered into evidence under Rule 404(b) to establish the existence of a common scheme, motive, intent, plan, or identity, we also recognized that in so permitting prior bad acts evidence, the trial court must compare the logical connection between the prior bad acts evidence and the crimes charged.  *Ivy*, 146 A.3d at 253.  This Court previously stated:

> Under Pennsylvania law, evidence of prior bad acts is admissible to prove "a common scheme, plan or design where the crimes are so related that proof of one tends to prove the others." *Commonwealth v. Elliott*, 700 A.2d 1243, 1249 (Pa. 1997). In *Elliott*, for example, the appellant was accused of sexually assaulting and then killing a young woman he approached outside a particular club (Purgatory) at 4:30 a.m.  Our Supreme Court affirmed a trial court's decision to permit three other young women to testify that the appellant had similarly preyed upon each of them as they were leaving the Purgatory club in the early morning hours, and that he had then physically and/or sexually assaulted them. *Id.* at 1250–51. Our Supreme Court concluded that the "close similarity between these assaults" was admissible to establish a common scheme, plan or design. *Id.*

---

[8]  We further question whether Appellant's awareness of the third-party PFAs is even relevant to the Commonwealth's "good cause" showing.

\*　　　\*　　　\*

> The purpose of Rule 404(b)(1) is to prohibit the admission of evidence of prior bad acts to prove "the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). While Rule 404(b)(1) gives way to recognized exceptions, the exceptions cannot be stretched in ways that effectively eradicate the rule. With a modicum of effort, in most cases it is possible to note some similarities between the accused's prior bad conduct and that alleged in a current case. To preserve the purpose of Rule 404(b)(1), more must be required to establish an exception to the rule—namely a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question. […T]his Court has warned that prior bad acts may not be admitted for the purpose of inviting the jury to conclude that the defendant is a person of unsavory character and thus inclined to have committed the crimes with which he/she is charged.

*Commonwealth v. Ross*, 57 A.3d 85, 103–105 (Pa. Super. 2012) (*en banc*) (some citations and quotations omitted).

Upon review of the record, the trial court did not examine the substance of the third-party PFAs proffered mid-trial to determine whether the conduct was similar to the alleged crimes. Thus, the trial court never identified a close factual nexus sufficient to demonstrate the connective relevance of the third-party PFAs to the crimes in question. Moreover, the certified record does not contain those third-party PFAs and, thus, we cannot examine the content independently. It was an abuse of discretion for the trial court to announce that it would allow the Commonwealth to use the third-party PFAs upon cross-examination of Appellant without first determining whether there was a close similarity with the evidence presented in the case at hand. Accordingly, the trial court abused its

discretion in granting the Commonwealth's request to present the third-party PFAs mid-trial without first assessing whether those PFAs met the requirements of Rule 404(b).

In his second issue presented, Appellant argues that the trial court abused its discretion by prohibiting him from re-calling A.A. after his mid-trial discovery of three statements posted to A.A.'s Facebook page. Appellant's Brief at 12-14, 21-24. More specifically, within the month subsequent to the incident at issue, Appellant averred that A.A. posted the following statements on Facebook: (1) "I'm bulletproof;" (2) "Everything is finally falling right into place," and; (3) "This is a picture of my son. I am so glad that we'll be spending New Year's together all by myself." *Id.* at 12.

In precluding the above-mentioned Facebook statements, the trial court determined that "there was no indication that these postings were connected to the incident" and were "remote," "vague," and "in no way exposed any false accusation or ulterior motive that would reflect upon [A.A.'s] credibility." Trial Court Opinion, 4/13/2016, at 40. The trial court further determined that there was no reason to recall A.A., as she "testified at length as to the events of the night of the incident" and "[g]reat latitude was afforded to defense counsel on cross examination to address and attack [] credibility." *Id.*

Contrary to the trial court, Appellant maintains, "[t]hese postings were directly probative of Appellant's defense, that [A.A.] made up the allegations

to gain advantage in the parties' custody case." Appellant's Brief at 12. Accordingly, Appellant argues that the trial court abused its direction in precluding the proffered evidence as remote, more prejudicial than probative, and serving only as a distraction to the jury. *Id.* at 13-14. He claims that two of the proffered Facebook posts were posted six days after the incident at issue and the third was posted 18 days later and, therefore, they were not remote. *Id.* at 22. Appellant posits that "[c]onsideration of prejudice is viewed with an eye towards the accused, not the accuser" and "[t]he trial court never articulated what 'prejudicial effect' these posts would have, how they would have a prejudicial effect, or on whom." *Id.* at 22-23. Appellant claims there would have been no distraction for the jury because the Facebook posts "went directly to the issue of the parties' custody battle and [A.A.'s] motive to lie and credibility." *Id.* at 24.

As noted earlier, admissibility of evidence is within the sound discretion of the trial court, but it depends

> on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.
>
> Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice.

***Commonwealth v. Loughnane***, 128 A.3d 806, 817–818 (Pa. Super. 2015). "We likewise review a trial court's decision to grant a party's request

to reopen the record for an abuse of discretion." ***Commonwealth v. Schultz***, 116 A.3d 1116, 1119 (Pa. Super. 2015) (citation omitted).

Here, upon review, we agree with the trial court's assessment and discern no abuse of discretion. Although the Facebook posts were made close in time to the incident at issue, the probative value in showing that A.A.'s desire to prevail in the custody dispute with Appellant motivated her to manufacture claims against Appellant was remote and vague. The proffered Facebook posts never mention Appellant specifically, nor the parties' custody dispute, and could conceivably refer to any number of matters. The posts simply do not support a reasonable inference or presumption regarding a material fact of whether the sexual assaults occurred. Thus, the evidence was not relevant and properly excluded.

In his third issue presented, Appellant avers, "[t]he Commonwealth offered and the trial [court] admitted the opinion testimony of emergency room physician Tuan-Ahn Lee Ung, M.D., that markings on the wrists and ankles of A.A. were consistent with ligature and strangulation marks." Appellant's Brief at 25. In sum, he argues:

> First, there was a question as to whether Dr. Ung was an expert as to issues of strangulation and ligature markings. An emergency department physician is not automatically nor necessarily an expert as to strangulation and ligature markings. Secondly, if [Dr.] Ung qualified as an expert in this area, [] Appellant was entitled to an [e]xpert [r]eport pre-trial, as well as a [curriculum vitae (CV)] which contained [Dr.] Ung's qualifications and credentials to give opinions on strangulation and ligature. Third, upon [the] Commonwealth['s] production of an [e]xpert [r]eport and CV, [] Appellant had the right to file a

- 21 -

*Frye* motion, or otherwise challenge Dr. Ung, pre-trial. Fourth, Pennsylvania Rule of Evidence 701(c) explicitly prohibits experts giving expert opinions and testimony under the guise of being lay witnesses[.]

*Id.* at 26 (emphasis omitted).[9]

The law on the admissibility of expert testimony is well settled:

Pennsylvania Rule of Evidence 702 permits expert testimony on subjects concerning knowledge beyond that possessed by a layperson. It is the job of the trial court to assess the expert's testimony to determine whether the expert's testimony reflects the application of expertise or strays into matters of common knowledge. We have explained:

Admissible expert testimony that reflects the application of expertise requires more than simply

_____

[9] As previously noted, Appellant does not specifically challenge the trial court's preclusion of his proffered expert, Dr. Wecht. The trial court found that Dr. Wecht did not render his opinion within a reasonable degree of medical certainty and impermissibly commented on A.A.'s credibility. Trial Court Opinion, 4/13/2016, at 16-18. On appeal, Appellant posits that it was error to permit the Commonwealth to elicit expert testimony from the hospital staff lay witnesses when "Appellant [was] not permitted to call Dr. Wecht, an actual expert on strangulation and ligature [marks], who had prepared a report which was furnished pre-trial to the Commonwealth[.]" Appellant's Brief at 29. Upon review, Appellant failed to include a challenge to the preclusion of Dr. Wecht's testimony in his statement of questions involved or in a separate argument section of his brief. *See* Pa.R.A.P. 2111(a); *see also* Pa.R.A.P. 2119. "Appellate arguments which fail to adhere to [our] rules [of appellate procedure] may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." ***Karn v. Quick & Reilly Inc.***, 912 A.2d 329 (Pa. Super. 2006). Moreover, Appellant baldly claims, "the trial judge should have permitted [Dr.] Wecht to testify with caution that he could not comment on the credibility of [A.A.]" Appellant's Brief at 29. However, because he cites no legal authority to support this contention, we find it waived. Accordingly, we need not address the trial court's ruling regarding the preclusion of Dr. Wecht.

having an expert offer a lay opinion. Testimony does not become scientific knowledge merely because it was proffered by a scientist. Likewise, expert testimony must be based on more than mere personal belief, and must be supported by reference to facts, testimony or empirical data.

Accordingly, we have stated the following test to distinguish between admissible expert testimony and inadmissible lay testimony by an expert:

The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief.

**Nobles v. Staples, Inc.**, 150 A.3d 110, 114–115 (Pa. Super. 2016)

(internal citations and quotations omitted).

Moreover, Pennsylvania Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Under this rule,

expert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot

- 23 -

be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

*Gillingham v. Consol Energy, Inc.,* 51 A.3d 841, 849 (Pa. Super. 2012). While an expert need not use "magic words," the foundation of her opinion must still be sturdy. As our Supreme Court has emphasized, the expert must base the substance of her opinion on a reasonable degree of certainty instead of mere speculation. *Commonwealth v. Spotz,* 756 A.2d 1139, 1150 (Pa. 2000) (forensic pathologist's testimony in first-degree murder trial as to victim's manner of death was properly based on reasonable degree of medical certainty, though pathologist did not use those "magic words," where pathologist explained that victim had been shot in neck and chest, that amount of hemorrhage surrounding gunshot wounds indicated she was shot while she was alive, and that minimal hemorrhage surrounding other wounds indicated she was run over after she died).

*Commonwealth v. Gonzalez*, 109 A.3d 711, 726–727 (Pa. Super. 2015) (parallel citations omitted). "The expert has to testify that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence." *Commonwealth v. Davido*, 868 A.2d 431, 441 (Pa. 2005) (internal citation omitted).

We find that the trial court abused its discretion in allowing the Commonwealth to elicit what amounted to expert trial testimony from the emergency room nurse, Tiffany Taylor (Nurse Taylor), and emergency room doctor, Dr. Ung, whom the Commonwealth failed to designate as experts prior to trial.

Pennsylvania Rule of Evidence 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Pa.R.A.P. 701.

Rule of Evidence 702, pertaining to expert witnesses, states:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702. Our Supreme Court previously noted that "[t]he average layperson is generally unacquainted with the physical processes accompanying ligature strangulation[.]" *Commonwealth v. Lopez*, 854 A.2d 465, 470 (Pa. 2004).

Moreover, this Court recently determined:

Unlike civil cases, there are no specific procedural rules governing expert reports in criminal cases aside from Pa.R.Crim.P. 573, which relates to discovery. The rule requires the Commonwealth to turn over the results of expert opinions in its possession or control. Specifically, Pa.R.Crim.P. 573(B)(1)(e) reads:

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the

- 25 -

> instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>
> *          *          *
>
> (e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth;

Additionally, Pa.R.Crim.P. 573(D) provides that both parties have a continuing duty to disclose evidence that is requested prior to trial that is subject to disclosure.

**Commonwealth v. Roles**, 116 A.3d 122, 131 (Pa. Super. 2015).

Finally, we note that this Court also determined that the rules governing expert and lay testimony do not preclude a single witness from testifying, or offering opinions, in the capacity as both a lay and an expert witness on matters that may embrace the ultimate issues to be decided by the fact-finder. **See Commonwealth v. Huggins**, 68 A.3d 962 (Pa. Super. 2013). "[T]he witness' association to the evidence controls the scope of admissible evidence that he or she may offer." **Id.** at 967. "In order to avoid jury confusion, the trial court [should] direct[] the Commonwealth to clarify when [] testimony, given in the form of an opinion, was based upon [] expert knowledge [], as opposed to [] testimony regarding the facts as personally perceived[]." **Id.** at 973. As we further made clear in **Huggins**, should a single witness testify in dual capacities, the trial court must instruct

"the jurors regarding lay versus expert testimony and [tell] them that they [are] solely responsible for making credibility determinations." *Id.*

Initially, we note that there is no dispute that the Commonwealth did not disclose any expert reports prior to trial. At the hearing on the Commonwealth's motion to preclude Dr. Wecht from testifying as an expert, the Commonwealth specifically stated that it did not intend to present expert testimony. Instead, the Commonwealth intended to call emergency room personnel "testifying as fact witnesses as to what they saw when they treated" A.A. or, in other words, as to "their actual findings[.]" N.T., 12/1/2014, at 13, 8. Moreover, in response to Appellant's request for expert reports from Nurse Taylor and Dr. Ung, the Commonwealth explicitly stated:

We have never produced reports from fact witnesses that are doctors or nurses that are treating rape victims who come into the emergency room. Their medical reports are the reports of what they saw and what they observed.

Beyond that, we have never produced anything more than that. They are there to testify as to what – if they saw a cut, if they saw a ligature mark. The description of what the victim appeared to look like.

They are there as fact witnesses. They're not making a decision of, oh, yes, this victim was raped. Or, oh, yes, that was [Appellant] who pummeled her in the head that caused the bruising. They're there as to what they saw. They're not creating an expert report.

*Id.* at 14. The trial court permissibly allowed Nurse Taylor and Dr. Ung to describe the injuries that they personally observed when treating A.A., most notably ligature and strangulation marks. Thus, as long as the

Commonwealth was relying solely upon lay witness testimony from Nurse Taylor and Dr. Ung, it was permissible.

However, the Commonwealth then asked each witness whether A.A.'s account of events was consistent with her injuries. *See* N.T., 1/14/2015, at 622-623, 638-643. These conclusions required causation expertise[10] and there was no proffered evidence that Dr. Ung or Nurse Taylor regularly examined ligature and strangulation marks or had scientific knowledge on the subject. As a result, the trial testimony of Dr. Ung and Nurse Taylor blurred the line between factual, lay-witness observations and expert testimony requiring specialized knowledge. Dr. Ung and Nurse Taylor properly testified regarding their personal observations of what they saw at the hospital. However, they also testified regarding the cause of A.A.'s injuries, which required specialized knowledge. While the hospital staff members in this case could have testified as both lay and expert witnesses under ***Huggins***, the Commonwealth did not provide notice or expert reports to Appellant prior to trial and there were no additional safeguards employed by the trial court to ensure that the jurors could separate expert opinions from the lay testimony. Hence, we discern the trial court abused its discretion and erred as a matter of law in permitting proffered lay witnesses to offer expert opinions at trial.

_____

[10] Even the trial court stated at trial, "There is no question that Dr. Ung is an expert[,] is there?" N.T., 1/14/2015, at 630.

Finally, Appellant argues that the cumulative effect of all the erroneous evidentiary rulings deprived him of a fair trial. Appellant's Brief at 32. Our Supreme Court decided:

> Although a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. A defendant is entitled to a fair trial but not a perfect one. If a trial error does not deprive the defendant of the fundamentals of a fair trial, his conviction will not be reversed.

*Commonwealth v. Noel,* 104 A.3d 1156, 1169 (Pa. 2014).

Moreover,

> [a]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. […] [T]he judgment of sentence will be affirmed in spite of the error only where the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.

*Id.* at 1172. The Commonwealth has the burden of proving harmless error beyond a reasonable doubt. *Poplawski*, 130 A.3d at 716.

Here, we cannot conclude beyond a reasonable doubt that the culmination of errors could not have contributed to the verdict. In sum, the trial court: (1) improperly prohibited Appellant from calling witnesses to rebut the Commonwealth's Rule 404(b) evidence; (2) impermissibly permitted the prosecution to use third-party PFAs discovered mid-trial without good cause (and without conducting a substantive Rule 404(b) analysis) which, in turn, influenced Appellant not to testify in his own right,

- 29 -

and; (3) allowed lay witnesses for the Commonwealth to testify regarding expert opinions without first providing notice or expert reports and without the trial court providing safeguards to assure the jury could differentiate between lay and expert testimony. We conclude that the prejudicial effect of these erroneous evidentiary rulings were significant and deprived Appellant of a fair trial.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/14/2017