J-A06026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES EDWARD KRYL | : | |
| | : | |
| Appellant | : | No. 672 WDA 2020 |

Appeal from the Judgment of Sentence Entered January 9, 2020
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0012985-2018

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:                          **FILED:  May 21, 2021**

James Edward Kryl appeals from the judgment of sentence, entered in the Court of Common Pleas of Allegheny County, after a jury convicted him of ethnic intimidation,[1] simple assault,[2] and two counts of conspiracy.[3]  After careful review, we affirm.

The trial court set forth the facts of the case as follows:

On July 7, 2018, at approximately 11:00 p.m., [] Kryl, along with several others, engaged in a racially motivated assault against Paul Morris, an African American gentleman, at a bar called the Jackman Inn.  On the night of the incident, [] Morris went to the [Jackman Inn] to deliver a thank-you card to his friend, Javon Jenkins, who had prepared a graduation dinner for Morris' son.

---

[1] 18 Pa.C.S.A. § 2710.

[2] 18 Pa.C.S.A. § 2701(a)(1).

[3] 18 Pa.C.S.A. §§ 903,  2710, 2701(a)(1).

Jenkins was working at the [Jackman] Inn that night and was expected to finish his shift at 11:00 p.m. []

As Morris waited for Jenkins to finish his shift, Morris stood at the end of the bar and watched television. [Morris] did not consume any food or alcohol while [there].

Although there were over a dozen people at the bar that night, there were no other black persons present, other than Morris and Jenkins, who is a fair-skinned, biracial man.

While Morris was waiting, he noticed a group of people drinking together in a back room. All of them were dressed in dark clothing. Approximately 20 minutes later, Jenkins finished his shift and told Morris that he wanted to go outside to smoke on the back deck. [T]o get to the back deck, the pair had to walk past the back room occupied by the group.

As Morris and Jenkins [] ma[de] their way towards the deck, someone from the group, who was visibly drunk, jumped up and told them to get out of here. Morris and Jenkins ignored the group and the person who had yelled and kept walking towards the deck.

As they entered the outside deck, Morris could smell marijuana in the air and saw that there were at least four people [] who were going in and out of the deck [area]. Morris immediately noticed their body language because they were whispering and turning around to look at him. Within a few minutes of Morris and Jenkins being outside, one of the females on the deck shouted for them to "get out of here." [N.T. Jury Trial, Sept. 2019,[4] at 79-80, 112]. Morris responded by asking "who the f[***] are you?" because he had never seen that person before. Morris then heard the group "talking some trash through the door" and heard someone from inside say something to the effect of "who them black [] n*****." [*Id.* at 80-81]. [Morris] could hear them because the door was open[] and there was only a screen door separating the spaces. Morris could feel that the situation might escalate beyond verbal taunts, so he tapped [Jenkins] on the shoulder and said, "Let's go." [*Id.* at 81].

---

[4] The court presided over a jury trial that took place between September 24, 2019, and September 26, 2019. The notes of testimony for the entire trial are consolidated in a single volume and are not further subdivided by date. We will cite to the jury trial notes of testimony collectively.

As Morris attempted to go through the screen door that led back inside of the bar, he was met by three [] men, one of whom was [Kryl], who physically blocked him from going inside[. Kryl smirked at Morris as he stood in his way]. [*Id.* at 82, 84-85, 113]. [The three] men were part of the same group involved in the earlier confrontation that occurred as Morris was initially making his way towards the back deck. [*Id.* at 82-83].

\* \* \*

Morris asked [Kryl] who he was and "told him to get out of" his way. [*Id.* at 86, 113]. Morris noticed that [Kryl] was wearing a dark shirt that had "some type of insignia," but he did not observe exactly what the emblem was. [*Id.* at 85]. [Kryl] responded with a racial slur, saying something to the effect of "we're here to eradicate you n****** one at a time[.]" [*Id.* at 86-87, 106].

\* \* \*

Before Morris could respond to [Kryl], someone else from the group "came over the top of [Kryl]'s head and sucker punched" Morris with a closed fist, injuring both of his lips, [and] causing them to bleed. [*Id.* at 88, 89, 114]. Morris was blindsided by the punch[.] In response, Morris "lunged forward and tried to get off the deck." [*Id.* at 90]. He tried to fight his way through the door, but, by that time, "everyone that was in that group" was hitting him, and he was surrounded. [*Id.* at 90-91, 94, 115].

[Morris] estimated [there were] eight [] to ten [] people in the group at that point. [*Id.* at 126, 135, 150].

Morris explained [at trial] that, as he was trying to defend himself against one person, [Kryl] "would come in with the cheap shots and punch" him. [*Id.* at 91-92]. At one point during the assault, [Kryl] was on top of Morris' back and neck, grabbing his throat and "squeezing the side of his neck." [*Id.* at 92, 98, 130-31]. There was a momentary break in the fight as Morris struggled to regain his senses and pick [] his glasses [up] from the floor, which had been knocked off of him during the assault. As he did so, he heard one of [Kryl]'s co-conspirators say, "Oh, I'm not the one bleeding, n*****, you're the one bleeding." [*Id.* at 95-97, 112].

The bartender[, Jean Miles,] observed Morris get punched, and she tried to help, by attempting to get [Kryl] off [] Morris' neck. [*Id.* at 98, 128-32]. She had noticed the all-white group [wearing dark clothing] when they had come into the bar earlier that

evening, and she had noted that, with the exception of [Kryl], she had not seen any of them at the [Jackman] Inn before.

Jenkins, who was also assaulted by the group, yelled for [Miles] to call the police. [*Id.* at 98-99, 131, 134]. Morris finally broke away from the group but went back into the fray to help [Jenkins]. [*Id.* at 99]. The group finally fled through the back of the bar when they heard that the police were being called. Morris stayed at the bar and waited for the police to arrive. [*Id.* at 100].

When law enforcement came upon the scene shortly after 11:40 p.m., Morris was visibly upset as he explained what had just transpired. Officer [Craig] Cannella with the Killbuck Township Police Department interviewed Morris and observed that his upper lip was bleeding and already swollen. [*Id.* at 151]. At that same time, [the officer observed that] a group of nine or ten people all came running up the side of the bar and tried to flee the area despite police commands to stop. [*Id.* at 100-01, 150].

[Kryl] was intercepted by Officer John Lennon with the Bellevue Borough Police Department[,] as he was attempting to flee with two [] other people[, Jeremy Ingram and Natasha Bowers]. [*Id.* at 147, 154-55, 176, 179-80]. Officer Cannella came into direct contact with [Kryl] and observed that he was wearing a black "shirt with a dog insignia . . . on the left chest" and blue jeans. [*Id.* at 153, 155-57]. He further described the shirt as having a keystone symbol on it [and a red bar through it]. [*Id.* at 332-33].

When Officer Lennon stopped [Kryl] and his two [] other associates, he made the same observation as to [Kryl]'s attire, noting that the men "had these black shirts with this symbol on it that was in the shape of a keystone on the chest with a pit bull's face in it." [*Id.* at 180].

[A]s a result of the assault, [Morris'] throat, forearm and thumb were painful and sore, and his teeth had been knocked through his lips. [*Id.* at 102-04]. At the time of trial, Morris was still [using] cortisone treatment for the injuries to his thumb and forearm, and [his doctor] recommended [that he seek] surgery. [*Id.* at 104]. The injuries sustained from the assault continued to cause [Morris] pain even a year later[.] [*Id.* at 105].

Trial Court Opinion, 9/2/20, at 5-12 (cleaned up).

After the jury convicted Kryl of the above-stated offenses, the court sentenced him on January 9, 2020 to: 1 to 2 years' incarceration followed by three years' probation for ethnic intimidation; 5 years' probation for simple assault, to be served concurrently with the probationary sentence for ethnic intimidation; and 2 years' probation at each of the remaining conspiracy convictions, ordered to run concurrently with the other probationary sentences. Additionally, the court ordered Kryl have no contact with Morris, Jenkins, Miles, and the Jackman Inn. Finally, the court ordered Kryl to pay $1,000 in restitution and court costs, and deemed Kryl to be ineligible for the Recidivism Risk Reduction Incentive (RRRI) Program.[5]

On January 17, 2020, trial counsel filed a post-sentence motion for reconsideration of sentence and a request that alternate counsel be appointed for purposes of appeal. On January 28, 2020, the trial court appointed Suzanne M. Swan, Esquire, to represent Kryl on appeal. On June 2, 2020, after Attorney Swan confirmed that no hearing was necessary, the court denied Kryl's post-sentence motion. Kryl filed a timely notice of appeal to this Court; he and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Kryl presents the following issue for our review: "Did the trial court abuse its discretion in allowing the Commonwealth to present rebuttal testimony through Officer [] Cannella that could have been offered

---

[5] *See* 61 Pa.C.S.A. §§ 4504-4505.

during the Commonwealth's case-in-chief, and which did not[,] in fact[,] rebut [Kryl]'s evidence?" Appellant's Brief, at 4.

Kryl challenges the trial court's admission of Officer Cannella's rebuttal testimony. Kryl claims that Officer Cannella impermissibly altered the testimony he gave on direct examination regarding the details of the shirt he was wearing at the time of the incident, which was essential to the Commonwealth's case-in-chief, and that Officer Canella had no basis for suddenly recollecting what shirt Kryl was wearing. Kryl further claims that the admission of that testimony prejudiced him because it connected him to an allegedly racist association of individuals, "Keystone United" a/k/a "Keystone State Skinheads," with whom Kryl actually shared no connection. Kryl argues that the jury was impermissibly left speculating regarding the purpose of Officer Cannella's rebuttal testimony since the court offered the jury no guidance on its relevance. Finally, Kryl concludes that the jury's verdict placed undue significance on Officer Cannella's rebuttal testimony, and this erroneous admission of evidence requires reversal and a new trial. We disagree.

It is well-settled that the admission of rebuttal evidence is within the sound discretion of the trial court. **Commonwealth v. Fletcher**, 750 A.2d 261, 278 (Pa. 2000) (citing **Commonwealth v. Jones**, 610 A.2d 931, 942 (Pa. 1992)).

> [T]he appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut. Where the evidence proposed goes to the impeachment of the testimony of his

opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered.

***Commonwealth v. Yocolano***, 169 A.3d 47, 56 (Pa. Super. 2017) (quoting

***Commonwealth v. Ballard***, 80 A.3d 380, 401-02 (Pa. 2013)).  Additionally,

[t]he introduction of evidence by the Commonwealth, after the defense rests its case, which could have been offered by the Commonwealth during its case[-]in[-]chief is not necessarily grounds for reversal.  Evidence is admissible in rebuttal to contradict that offered by defendant or his witnesses, even though[,] by doing so[,] the Commonwealth corrects fatal defects in its case[-]in[-]chief.

 ***Commonwealth v. Hickman***, 309 A.2d 564, 567 (Pa. 1973) (citations

omitted).  ***Compare Pittsburgh-Des Moines Steel Co. v. McLaughlin***, 466

A.2d 1092, 1097 (Pa. Cmmwlth. 1983) (trial court may properly exclude

rebuttal evidence if it could have been presented by offering party during its

case-in-chief); ***with Flowers v. Green***, 218 A.2d 219, 220 (Pa. 1966) ("For

matters properly not evidential until the rebuttal, the proponent has a right to

put them in at that time, and they are[,] therefore[,] not subject to the

discretionary exclusion of the trial court.").

At trial, on direct examination, Officer Cannella testified as follows:

Q.  Did you respond to any calls on July 7th, 2018?

A.  Yes.  Approximately 11:40 p.m., I believe we had received a call from Jean Miles at the Jackman Inn.  The call goes into the 911 Call Center.  I get the call from dispatch about a bar fight at the bar.

\*     \*     \*

Q.  And in responding to that call, did you come into contact with anyone you see in the courtroom here today?

A. Yes, during the investigation of that call, I came in contact with Mr. Kryl[,] who is seated to the right of his counsel in the gray suit, blue tie.

* * *

It was quite chaotic upon us pulling up to the scene. Numerous people outside the bar. . . . There was a large group of people, as you heard other people testify, there was approximately ten people or so. They came up from the side yard at the bar which they would have been coming from the back of the bar[,] off that back deck.. . . I yelled for them to stop. They continued down Jackman Avenue towards Elizabeth Avenue. From the bar to Elizabeth Avenue is maybe 200 feet, maybe 250 feet estimated. Had already called for other departments to back us up, which they pretty much automatically do when you get a bar fight[.] . . . The Bellevue Police were already responding[.] . . . I had radioed to them that some people had taken off towards Elizabeth Avenue, if they could try to head them off. They had radioed to me that they had stopped two males and a female at the intersection of Elizabeth Avenue and Howden Street. I asked them to hold onto them while we kind of gathered information at the scene to find out exactly what was going on.

* * *

Q. The three who had been stopped by Bellevue, those were some of the—as far as you know, those were some of the group that had [come] from around the corner?

A. I believe them to be, yes, as they were—I'd say maybe another hundred feet from where I last saw them, lost sight of them.

* * *

[T]hey were all [wearing] dark clothing, black shirts, blue jeans, and the Bellevue Police had notified [me] that the three they had [in custody] had the matching clothes, dark shirts, black shirts, blue jeans.

Q. So when you say "matching clothes," was it just that the shirts were the same color or was there anything else they had in common?

A. Just the shirts had the same color **at the time**. **It was dark then. So I had a group of people going away from me but**

**I could see that they were all dark clothing. I did see them as they came up from beside the bar.**

Q. Okay.

A. We had gotten word there was someone in the weeds behind the Jackman Inn. We went to investigate. A male, a white male, black shirt, blue jeans[,] took off from us running across the backyards. We gave chase. . . . His name was [] Terrence Stockey. Took him into custody. Put him in the back of our police car. **I then traveled down to where the Bellevue Police were at Howden and Elizabeth. They had taken the three names of the people they had there,** that was Bowers, Ingram **and Kryl.**

* * *

Q. **And you personally had contact with all six [individuals arrested that night] at one point or another, correct?**

A. **That is correct, yes.**

Q. **And one of those [] was Mr. Kryl?**

A. **One of those [] was Mr. Kryl, yes, he was one of the three that Bellevue stopped.**

Q. Do you recall what description you gave to Bellevue about the people running out?

A. Just the dark black shirts and jeans, you know, all dark clothing, and the direction of travel that they went.

Q. **Once the six of them were stopped, did you speak to any of the six of them about what happened that night?**

A. **Yes, I did. I spoke with the now four that we had down at the intersection of Howden and Elizabeth.** Stockey had a scratch on the side of his nose. I asked him,["]Why did you run?["] He said, ["]Everybody said to run, so I ran.["] He had a scratch on the side of his nose. I asked him where that came from. Said he got hit by a black male in the bar. I said, ["]Anything you want to do with it?["] He didn't have any interest.

* * *

Q. **Did you give anyone other than Mr. Stockey a chance to tell you what happened?**

A. **I did, yes. They were all together whenever I asked that statement to Mr. Stockey.**

\* \* \*

I don't remember what Stockey was wearing. **Kryl had a shirt with a dog insignia, I believe, on the left chest.** And I think it had to be Ingram, he had a shirt with—I think there was a flag on the back of it, and it had KSS on it.

Q. Did those shirts match exactly or just have some logos in common?

A. **They were different, they were different.**

N.T. Jury Trial, Sept. 2019, at 147-58 (emphasis added).

At trial, Kryl testified in his own defense that, on the date in question, he hosted a benefit cookout in his backyard for Travis Cornell, a diabetic friend, who was suffering from blood clots, and, who has since passed away. Kryl testified that, from his rear yard, he can see the Jackman Inn, but that he must walk 2 to 3 minutes around the block to actually enter the establishment. He and the other cookout attendees decided, at some point after several hours, to leave Kryl's yard and go to the Jackman Inn. Regarding how events progressed on that date, Kryl testified as follows:

Q. Now, at your party what were you wearing?

A. I was wearing basketball shorts, tennis shoes[,] and my Penn State wrestling shirt.

\* \* \*

Q. Okay. Now, **when you went to the [Jackman Inn next door], did you change shirts from the Penn State shirt to another shirt?**

A. **Yes.**

Q. And **tell the jury what shirt did you put on?**

- 10 -

A. **I put on my Villalobos Pit Bull for Parolee sport shirt.**

Q. **[Y]ou have the shirt with you in your sack here, and you're able to show it, correct?**

A. **Yes.**

Q. And what did that shirt signify?

A. The shirt signifies the—

Q. Tell the jury, first, **what kind of insignia does the shirt have on it?**

A. **It has a pit bull head and a chain around the pit bull head**, and it signifies releasing the dogs from their chains, pulling the chains around the dog's head.

*Id.* at 263-74 (emphasis added). Kryl concluded by testifying that, at some point while at the Jackman Inn, he heard that people were fighting on the back deck and, while trying to stop Cristeen Cox and Jennifer Shields from also going out onto the deck, he was struck from behind in the back of the head, which caused him to lose consciousness. Kryl claimed the next thing he remembers is sitting at the corner of Elizabeth Avenue and Howden Street along a wall, being questioned by an officer and then he was placed in handcuffs.

On rebuttal, the Commonwealth recalled Officer Cannella, who testified as follows:

Q. [] Do you remember hearing testimony that that was the shirt [Kryl] was wearing?

A. Yes, I remember that.

Q. **Do you remember whether or not that was the shirt [Kryl] was wearing?**

A. **I do remember that that is not the shirt that [Kryl] was wearing on July 7th.**

Q. What details do you remember from [Kryl]'s shirt?

A. **The shirt that he was wearing the night of the incident[,] it did have the dog head that appears to be the same dog head, however, it did not have a chain around it as on the shirt that was[] displayed today, instead[,] it had a keystone insignia, the sign of a keystone around the outside of it.**

Q. Were there any colors within that keystone?

A. **There was also a red bar in that.**

The court: A red what, I'm sorry?

[Officer Cannella]: A red bar. I do not recall if it was going across, up and down, but there was a red bar in that.

*Id.* at 332-33 (emphasis added). On cross-examination, Officer Canella confirmed that he had, in fact, seen the front of Kryl's shirt on the night in question:

I did have interaction with them. After I picked up—if you'll recall, **after I picked up Mr. Stockey**[,] after running through the yards, picked him up on Howden Street, **went to the intersection with the Bellevue Police, verified that those people were those people[,] being Kryl, Bowers and Ingram**, and then released them to their house **and then went back up in front of the bar.**

*Id.* at 335 (emphasis added).

Here, our review of the transcript reveals that, on direct examination, Officer Cannella testified that he came across Kryl **twice on the night of the assault**. First, when arriving at the scene, Officer Cannella observed Kryl, who was among a group of approximately ten people, come from the side of the Jackman Inn, ignore the officers' instructions to stay at the scene, and proceed down Jackman Avenue toward Elizabeth Avenue. *Id.* at 150. At that point, due to the nature of the emergency call, other police departments were

- 12 -

already responding to the scene. Officer Cannella used his radio to inform those other responding officers that a group of people ignored his commands to stay at the scene, and was headed down Jackman Avenue. Shortly thereafter, the Bellevue Borough police officers notified Officer Cannella that they apprehended three individuals matching the description he had given, running from the scene, only a few hundred feet from where Officer Cannella lost sight of them. Officer Canella's testimony reveals that, up to that point, he only observed Kryl's dark clothing and jeans, without noting anything further with specificity, because Kryl was headed away from him and it was dark outside. *Id.* at 153-54. Officer Cannella additionally testified that, after arresting Stockey, he brought Stockey to the intersection of Elizabeth Avenue and Howden Street, where Bellevue Borough police officers had already arrested Kryl. *Id.* At that point, **Officer Cannella had a second chance to observe Kryl's clothing from a much closer perspective and for an extended period of time**. *Id.* at 154-56. Indeed, Officer Cannella testified that he questioned Kryl at that location, and that he observed Kryl wearing a shirt with a dog insignia on the left chest, which was a different shirt as that worn by Ingram, who was also arrested at that location with Kryl. *Id.* at 157. Then, at trial, in his own defense, **Kryl testified that the shirt he wore to the Jackman Inn** on the night in question was a "Villalobos Pit Bull for Parolee sport shirt" which "**has** a pit bull head and **a chain around the pit bull head**." *Id.* at 266 (emphasis added). Kryl also showed that shirt to the jury during his testimony. *Id.*

Officer Canella, on rebuttal, directly contradicted Kryl's factual assertion regarding which shirt he wore to the Jackman Inn, *see Yocolano*, *supra*, by testifying that

> The shirt that [Kryl] was wearing the night of the incident[,] it did have the dog head that appears to be the same dog head, however, **it did not have a chain around it as on the shirt that was**[] **displayed today, instead**[,] **it had a keystone insignia, the sign of a keystone around the outside of it** [**and a red bar in it**].

N.T. Jury Trial, Sept. 2019, at 332 (emphasis added).

We find that Officer Cannella's rebuttal testimony constituted proper impeachment evidence. **See** Pa.R.E. 607(b) ("The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these Rules."). Therefore, it was admissible as a matter of right, **see Flowers**, **supra**, and, consequently, was properly within the scope of rebuttal. **See Yocolano**, **supra**. We conclude that the trial court did not abuse its discretion in admitting Officer Cannella's rebuttal testimony, where that impeachment evidence could only have been admitted on rebuttal, and was admissible as of right.[6] **See Fletcher**, **supra**.

---

[6] Contrary to Kryl's claims, **see** Appellant's Brief, at 13, the jury did not hear any evidence at trial regarding what the members of Keystone United promote or for what the organization stands. Morris, at one point, testified that Kryl's brother was known to be a "skinhead," but Morris' testimony did not connect Kryl's brother to Keystone United. N.T. Jury Trial, Sept. 2019, at 117. Also, Kryl did not object to that testimony. **Id.** at 117-18. Moreover, at trial, the Commonwealth cross-examined Kryl by showing him a photograph which Kryl, himself, testified depicted a group of people which included himself, and Cornell, as well as others whom Kryl did not recognize. In the photograph,

Judgment of sentence affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/21/2021

---

Kryl testified that he is holding the left corner of a banner which represented the "Keystone United flag," and which photo was taken at that organization's "Yule dinner." *Id.* at 302-03. Kryl testified that he was not a member of that organization, but accepted Cornell's invitation to attend the event, and held the banner because he was asked to stand in front of the group in the photo because he is short. *Id.* at 306. Finally, the only time Keystone United was discussed as an organization that promotes hatred occurred at **sentencing**, well after the jury returned the verdict; Morris stated to the court, during his victim impact statement, *see* 42 Pa.C.S.A. § 9738, that "James Kryl has easily been Googled to find that he has been a longstanding member of the Keystone United, previously Keystone State Skinheads, a recognized hate group by the Southern Poverty Law Center, as far back as 2006." N.T. Sentencing Hearing, 1/9/20, at 20.