J-A24001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　　:　　　　　　PENNSYLVANIA
　　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
JOMAR PEREZ-ESCOBALES　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Appellant　　　　　　　:　　No. 1748 MDA 2024

Appeal from the Judgment of Sentence Entered October 7, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0001595-2020

BEFORE:  DUBOW, J., KUNSELMAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:　　　　　　　　**FILED: OCTOBER 21, 2025**

Jomar Perez-Escobales ("Perez-Escobales") appeals from the judgment
of sentence imposed by the Dauphin County Court of Common Pleas ("trial
court") following his conviction of third-degree murder.[1]  Perez-Escobales
argues that the trial court abused its discretion by admitting evidence
pursuant to Pa.R.E. 404(b) and challenges the discretionary aspects of his
sentence.  We affirm.

The trial court set forth an extensive discussion of the underlying facts:

> On April 12, 2020, at approximately 3:30 p.m., Harrisburg
> Bureau of Police Patrol Officer Tony Elliot responded to a dispatch
> of an unresponsive person in the parking lot of the Park
> Apartments at the 1400 Block of South 15th Street in the City of
> Harrisburg.  When Officer Elliot pulled into the parking lot, he
> observed a male lying between two parked vehicles in the parking
> lot.  Officer Elliot was the second officer to arrive at the scene.

---

[1] 18 Pa.C.S. § 2501(c).

The first officer was near the victim[, Joseph Ayala-Maya ("Ayala-Maya")]. [Ayala-Maya] had been declared deceased. Officer Elliot assisted with setting up crime scene tape and canvassing vehicles to determine ownership. During the canvas, Officer Elliot noted a 2005 red Nissan Maxima[,] which police later linked to [Ayala-Maya]. The red Nissan was parked approximately one quarter of a mile from Park Apartments. The motor vehicle recording device on Officer Elliot's vehicle depicted a person walking from what police believed to have been [Ayala-Maya's] house. The person carried two large bags and entered a waiting taxi. The taxi then drove south on 13th Street.

Harrisburg Bureau of Police Forensic Investigator Michael Maurer testified that he responded that day to a request to assist with investigation of a homicide in the area of South 14th and Magnolia Steets. [Investigator] Maurer took photographs at the scene. Investigator Maurer testified regarding photographs which depict [Ayala-Maya] lying between two parked vehicles and blood on the side of one of them.

[Investigator] Maurer also photographed bloodstains on the door and landing of the front steps at 1405 South 13th Street. Photographs taken of the interior of the house at 1405 South 13th Street depict a red baseball bat and blood stains at the top of the stairs. Photographs taken on the second floor depict a hole in the wall consistent with a bullet hole.

Police obtained video footage captured a few houses away from 1405 South 13th Street. The video initially depicts a black vehicle, later determined to be [Perez-Escobales'] vehicle, drive by. The last portion of the video depicts [Ayala-Maya] running toward where his body was found, leaving a shoe behind. The video next depicts [Perez-Escobales] walking to his vehicle and [Perez-Escobales'] vehicle drive by.

Forensic pathologist Wayne Ross, M.D., conducted an autopsy and prepared a postmortem report regarding [Ayala-Maya]. Toxicology studies revealed a high level of norfentanyl in his system as well as cocaine and marijuana byproducts. Dr. Ross noted that [Ayala-Maya] was 5'10" and had sustained a gunshot to his back behind the left shoulder. Dr. Ross noted the entrance wound just behind the left shoulder and an exit wound to the right side of the chest. Dr. Ross also observed injuries to the face, arms, elbow and knees consistent with [how Ayala-Maya fell].

Because Dr. Ross did not see evidence of soot or gunshot powder on [Ayala-Maya's] clothing or wound, he concluded that the shot was fired from a distance of more than 3-4 feet. The measurement of the wound was consistent with the size of a 9 mm bullet. Dr. Ross determined that the shot entered the left side of the back, traveled from back to front, left to right, downward at a 45-degree angle. The bullet passed through the left lung, then across the midline of the chest, travelled through the right lung where it produced large holes causing [Ayala-Maya] to bleed out, then exited the right side of the chest. Dr. Ross opined that based upon [Ayala-Maya's] height and the location of the wounds, the shooter was at a vantage point higher than [Ayala-Maya].

Dr. Ross also reviewed photographs of bloodstains on the steps. Based upon the blood drip splatter, Dr. Ross opined that [Ayala-Maya] dropped the blood as he moved downward on the staircase. Dr. Ross determined the cause of death as a gunshot wound to the back and the manner of death as homicide.

Savannah Nieves [("Nieves")] testified that she and [Perez-Escobales] were boyfriend and girlfriend during 2018 and 2019, which she described as a very toxic relationship. She and [Perez-Escobales] have a son together, born July 2019. [] Nieves described [Perez-Escobales] as abusive. She testified that in July 2019, she called police regarding an altercation in which [Perez-Escobales] slapped and punched her. [] Nieves testified that she attempted to remain with [Perez-Escobales] after the July 2019 incident because she needed a place to stay. In October 2019, [] Nieves called police after [Perez-Escobales] threatened her with a gun following her attempt to leave him. [] Nieves left the state. Their son remained with [Perez-Escobales]. [] Nieves returned to Harrisburg in April 2020 and began living at 1405 South 13th Street. She testified that she communicated with [Perez-Escobales] regarding efforts to co-parent their son. Beginning in [April] 2020, [] Nieves began a romantic relationship with [] Ayala-Maya. [] Nieves testified that she did not know that [Perez-Escobales] and [Ayala-Maya] knew each other.

[] Nieves testified that at around 11 a.m. or 12 o'clock noon on the day of the incident, she was taking a shower. [] Ayala-Maya was in the bathroom, fully clothed, talking to her. She and [Perez-Escobales] communicated earlier that day about dropping

- 3 -

off an Easter basket for their son. [] Nieves testified that they did not talk about [Perez-Escobales] coming to her house.

[] Nieves testified that she heard [Perez-Escobales] calling her name from the living room. She testified that she became frightened and ran to her bedroom to get dressed and that [] Ayala-Maya followed her. [Perez-Escobales] came up the stairs with a red metal bat cursing in Spanish. He followed the two into the bedroom and stood at the door. [] Nieves testified that she knew the red baseball bat as the one [Perez-Escobales] kept in his car. She testified she attempted to get the bat from [Perez-Escobales] as he attempted to hit her and [] Ayala-Maya, who stood behind her. She [grabbed the bat and] attempted to hit [Perez-Escobales] with the bat. [] Nieves testified that as soon as she grabbed the bat from [Perez-Escobales], he pulled a black 9mm gun from his waistband. [Perez-Escobales] pointed the gun at [] Nieves['] and [] Ayala-Maya['s] faces. [] Ayala-Maya ran out of the room toward the staircase. [Perez-Escobales] followed him. The two men argued as they descended the stairs. [] Nieves heard [] Ayala-Maya plead for his life. [] Nieves saw the gun in the air and heard a pop. [] Ayala-Maya left through the front door and [Perez-Escobales] fled through the back door. [] Nieves ran downstairs to lock her doors. She did not know [] where [] Ayala-Maya ran. When she returned upstairs she heard sirens and saw fire trucks arriving. She saw [] Ayala-Maya's shoe on the street.

[] Nieves began receiving messages from [Perez-Escobales]. [Perez-Escobales] stated that he was sorry for what happened and that she should meet him at his mother's house in Steelton. [Perez-Escobales] told [] Nieves to bring [] Ayala-Maya's phone and fanny pack, which had been left behind, and the shell casing. [] Nieves testified that she did not know then that [] Ayala-Maya had been killed. She testified that she felt she had no choice but to comply with [Perez-Escobales'] directives to retrieve items and come to his mother's house. She dropped the shell casing as she left the house. She called a cab and left with two bags.

When she arrived at [Perez-Escobales'] mother's house in Steelton, [Perez-Escobales'] stepfather took the bag with [] Ayala-Maya's belongings. [Perez-Escobales], his mother and stepfather developed a plan for [Perez-Escobales] and [] Nieves to escape to Lancaster. [] Nieves testified that she felt she had no alternative and was forced to comply with the plan. [Perez-Escobales']

stepfather drove [Perez-Escobales] and [] Nieves to Lancaster. While in Lancaster, [Perez-Escobales] attempted to convince [] Nieves of a story that [Perez-Escobales] was never at her house or a part of the shooting. They returned to [Perez-Escobales'] mother's house where [] Nieves remained until [Perez-Escobales'] arrest.

[] Nieves testified as to images depicted on video footage. She testified that the video depicts her leaving the house carrying bags. She identified images of [Perez-Escobales'] vehicle and of [] Ayala-Maya running out of her house. She identified [] Ayala-Maya's red car.

[] Nieves testified that when she initially spoke to police, she did not provide complete information as she feared being named as an accomplice. She eventually told investigators what occurred. On May 8, 2020, Harrisburg City Police Investigator Nina Maus met with [] Nieves, her counsel and a Dauphin County Deputy District Attorney. Investigator Maus testified that in accordance with a proffer agreement, [] Nieves agreed to cooperate. On cross-examination, [] Nieves testified that the Commonwealth did not charge her with accomplice liability or tampering with evidence.

Harrisburg City Police Department Criminal Investigation Detective Ryan Neal prepared a search warrant for 1919 North Street, [Perez-Escobales'] residence. On April 14, 2020, as Detective Neal sat in his parked police vehicle a few doors away, [Perez-Escobales] drove by in his black Mitsubishi. Detective Neal followed the vehicle. The vehicle pulled over. [Perez-Escobales] put his head out of window and asked who the detective was looking for. Detective Neal responded that he was looking for him, [Perez-Escobales]. [Perez-Escobales] and his passenger got out of the vehicle. Officer Neal drew his service revolver and ordered both men to the ground. The passenger retrieved something from the vehicle and fled. Detective Neal did not pursue the passenger. Police [later] detained the passenger, who they identified as Brian Escobales, [Perez-Escobales'] brother. Police recovered a bag and marijuana and a gun from a space in a retaining wall in the area through which [Perez-Escobales'] brother fled. Fingerprints obtained from the firearm matched [Perez-Escobales'].

The prosecution and the defense stipulated that on April 14, 2020, pursuant to a search at [Perez-Escobales'] residence, police recovered a 9 mm Smith & Wesson semiautomatic pistol.

On April 17, 2020 Lower Paxton Township Police Officer Cody Webster executed a search warrant at 712 South Second Street, Steelton, [Perez-Escobales'] mother's house. Police found a bag which contained a firearm, a Taurus 9 mm.

[Perez-Escobales] testified on his behalf. He testified that on April 12, 2020, [] Nieves sent him a picture of an Easter basket which she said she purchased for their son, who lived with [Perez-Escobales]. He understood the message to mean that [] Nieves wanted him to pick up the gift, since she did not have a car. In prior visits to her house, [Perez-Escobales] and [] Neives had sexual relations. [Perez-Escobales] described the relationship as toxic and violent, that [] Nieves enjoyed making him jealous, and regularly communicated that she wished to maintain a sexual relationship. [Perez-Escobales] testified that when he received what he construed as an invitation to her house, he parked in the back alleyway.

[Perez-Escobales] testified that on April 12, 2020, he went to [] Nieves' house. When he arrived, he called her name several times from the living room. When she did not answer, he went to her room. He testified that she was not fully dressed and that she appeared nervous or scared. [Perez-Escobales] saw [] Ayala-Maya in the room. [Perez-Escobales] testified that he and [] Ayala-Maya were like brothers, and that he felt confused and betrayed. [Perez-Escobales] testified that he called Ayala-Maya names and that the two began fighting. [Perez-Escobales] testified that he felt Ayala-Maya touch [Perez-Escobales]'s gun on his right hip. [Perez-Escobales] took out his gun and held it in his right hand. The two continued to argue. [Perez-Escobales] told Ayala-Maya to leave. Ayala-Maya descended a few steps. [Perez-Escobales] saw Ayala-Maya tugging at his pants. [Perez-Escobales] pulled the trigger and shot Ayala-Maya.

[Perez-Escobales] left the house and went to his mother's house in Steelton. He became scared when he learned that a person was found dead at the Park Apartments. He called [] Nieves and told her to come to his mother's house. The two went to Lancaster. Police arrested [Perez-Escobales] on April 14, 2020[.]

- 6 -

Trial Court Opinion, 4/4/2025, at 2-9 (citations omitted).

The Commonwealth charged Perez-Escobales with criminal homicide and burglary. Prior to trial, Perez-Escobales filed a motion in limine seeking to prohibit the introduction of testimony by Nieves claiming that he had threatened her with a firearm in July 2019. The Commonwealth filed a response, in which it agreed that it sought to introduce the July 2019 incident as well as an October 2019 incident, during which Perez-Escobales shoved Nieves into his vehicle and pulled out a gun. Following a hearing, the trial court allowed the introduction of both incidents at trial, finding the evidence to be relevant to show the natural development of the case.

The case proceeded to a jury trial in July 2024. Ultimately, the jury found Perez-Escobales not guilty of first-degree murder, second-degree murder, voluntary manslaughter, and burglary, but found him guilty of third-degree murder. The trial court sentenced Perez-Escobales to eighteen to forty years in prison, plus fines and costs. Perez-Escobales filed a post-sentence motion, which the trial court denied. This timely appeal followed.

Perez-Escobales raises the following questions for our review:

1. Did the trial court abuse its discretion in denying [Perez-Escobales'] motion in limine to exclude uncharged conduct of abuse between [Perez-Escobales] and his ex-paramour, when the conduct had no relationship to prove a separate homicide and was more prejudicial than probative[?]

2. Did the court abuse its discretion, given the circumstances of [] Perez-Escobales, in imposing a guideline range sentence

when the rehabilitative needs of [Perez-Escobales] could be accomplished by a lesser sentence?

Perez-Escobales' Brief at 5 (unnecessary capitalization omitted).

**Prior Bad Acts Evidence**

Perez-Escobales argues that the trial court abused its discretion in admitting evidence of prior bad acts he committed in July and October 2019. *Id.* at 19. He contends that these incidents had nothing to do with the facts underlying the murder, and notes that to be admissible under the res gestae exception under Pennsylvania Rule of Evidence 404(b)(2), the evidence must tell the story of the events leading to the charged crime. *Id.* at 20, 25-26, 29. More specifically, Perez-Escobales asserts that the July and October 2019 incidents involved isolated domestic disputes with Nieves, while this case involves him "entering the house, getting into a fight with someone who is not [] Nieves, and ultimately harming them." *Id.* at 25-26. In Perez-Escobales' view, these prior incidents show Nieves' motivation for her actions, not his. *Id.* at 26. He maintains that the evidence was prejudicial because it tended to show him as a serial abuser who controlled Nieves, which, in turn, imputed malice to support the murder conviction. *Id.* at 28. He also notes that the cautionary instruction was "superfluous" because the evidence should never have been introduced at trial. *Id.* at 19.

Additionally, Perez-Escobales argues that the admission of this evidence was not harmless. *Id.* at 28-29. Perez-Escobales explains that the introduction of his prior bad acts prejudiced him, as it showed him to be a

- 8 -

serial abuser, which imputed malice into the shooting death. *Id.* at 28. Perez-Escobales asserts that the evidence was not cumulative to other evidence. *Id.* Further, Perez-Escobales claims that the properly admitted evidence was not so overwhelming to overcome the prejudicial effect of the error. *Id.* at 29. To that end, Perez-Escobales contends that he and Nieves testified to two separate versions of the shooting, including the identity of the person responsible for causing the conflict and acting as the aggressor. *Id.* Perez-Escobales maintains that the introduction of the evidence caused the jury to believe Nieves' version of events over his testimony that he shot Ayala-Maya, believing him to have a firearm. *Id.*

"The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Ganjeh*, 300 A.3d 1082, 1091 (Pa. Super. 2023) (citation and brackets omitted). "An abuse of discretion is not merely an error in judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id.* (citation omitted).

"Relevance is the threshold for admissibility of evidence." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015) (en banc).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact. Relevant evidence may nevertheless be

- 9 -

excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Commonwealth v. Danzey*, 210 A.3d 333, 342 (Pa. Super. 2019) (quotation marks omitted); *see also* Pa.R.E. 401-403.

"Evidence of 'other crimes, wrongs, or other acts' is inadmissible solely to show a defendant's bad character or his propensity for committing criminal acts." *Commonwealth v. Hairston*, 84 A.3d 657, 665 (Pa. 2014) (quoting Pa.R.E. 404(b)(1)). Nevertheless, such evidence of prior bad acts is admissible when relevant for another purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." Pa.R.E. 404(b)(2). This list of other purposes is "non-exhaustive." Pa.R.E. 404(b), cmt. Relevantly, we have recognized "[a]n exception to Rule 404(b) … that permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts." *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016); *see also Hairston*, 84 A.3d at 665 (noting that under the "res gestae" exception, a prior bad act may be admitted as part of the history or natural development of the case to explain "the complete story"). To establish one of these exceptions, "there must be a specific 'logical connection' between the other act and the crime at issue which establishes that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances."

*Commonwealth v. Cox*, 115 A.3d 333, 337 (Pa. Super. 2015) (en banc) (citation omitted). As it relates specifically to the res gestae exception,

> courts must consider factors such as the strength of the other crimes evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Commonwealth v. Yocolano*, 169 A.3d 47, 55 (Pa. Super. 2017) (citation omitted).

"In criminal matters, [prior bad acts] evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." *Ganjeh*, 300 A.3d at 1091 (citation and quotation marks omitted). "Additionally, the term unfair prejudice in Rule 404(b)(2) means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Gilliam*, 249 A.3d 257, 272 (Pa. Super. 2021) (citation and quotation marks omitted); *see also* Pa.R.E. 403, cmt. "When weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect of the proffered evidence." *Gilliam*, 249 A.3d at 272 (citation and brackets omitted).

The trial court states that it admitted the evidence of Perez-Escobales' prior bad acts under the res gestae exception:

> We deemed the July 2019 and October 2019 instances of domestic violence, during which [Perez-Escobales] displayed a firearm, as relevant to the natural development of the case.

Specifically, those instances assisted the jury in understanding the sequence of events, including the deteriorating relationship between [Perez-Escobales] and, ultimately, [] Nieves' submission to [Perez-Escobales'] demand that she assist in the coverup of the homicide. The jury was free to evaluate [] Nieves' [credibility] and place the weight they deemed appropriate on evidence of the prior conduct.

* * *

Further, in accordance with [Perez-Escobales'] request, we instructed the jury as to [the] evaluation of evidence and testimony we instructed [sic]:

This was an unusual factor, too, that I want to give a specific instruction on. You've heard evidence in this case tending to prove, at least according to the witnesses, that the [Perez-Escobales] was involved in two prior domestic violence related incidents against a witness, [] Nieves.

These acts are not what he's on trial for. And generally, we don't even bring evidence of uncharged misconduct. But it was brought in because it was relevant for a very limited purpose and that was to put it into context and perhaps explain certain steps that [Nieves] may have taken or not taken following the shooting.

So it goes solely for that purpose of explaining in context. But remember, none of those incidents was actually attempted to be proven. There's no conviction on it. So it has to be very carefully considered only in potentially explaining why [Nieves] listened to what [Perez-Escobales] said, took evidence from the house apparently, and brought them over to see her son and [Perez-Escobales].

So that's the only area where that's relevant and should be considered. And it shouldn't have any other impact that might be detrimental to the [Perez-Escobales]. …

[N.T., 7/31/2024, at 473-74.]

Accordingly, we properly allowed admission of evidence of prior instances of domestic violence.

Trial Court Opinion, 4/4/2025, at 15-16.

We conclude that the trial court abused its discretion in admitting the evidence of the July and October 2019 domestic violence incidents. Although the trial court stated in its Rule 1925(a) opinion that this evidence was relevant to show the sequence of events leading to the murder, as reflected above, it instructed the jury that the evidence was admitted to aid it in understanding why Nieves assisted Perez-Escobales following the murder. Although we acknowledge that a witness or victim's failure to file a prompt report to police can substantially impact their credibility at trial, *see*, *e.g.*, *Commonwealth v. Mendez*, 74 A.3d 256, 263 (Pa. Super. 2013), Nieves' actions after the shooting are not relevant to proving whether Perez-Escobales committed the homicide.

Nor was there any factual nexus presented to link the prior bad acts to Perez-Escobales' commission of the murder. *See Yocolano*, 169 A.3d at 55; *see also Commonwealth v. Bidwell*, 195 A.3d 610, 626 (Pa. Super. 2018) (stating that "there must be a firm basis for concluding that the crime currently on trial grew out of or was in any way caused by the prior set of facts and circumstances") (citation and quotation marks omitted); *Commonwealth v. Brown*, 52 A.3d 320, 332 (Pa. Super. 2012) (the res gestae exception is "properly invoked when the bad acts are part of the same transaction involving the charged crime"). Perez-Escobales' alleged domestic abuse against Nieves occurred several months before the shooting and were

- 13 -

not part of the sequence of events that led to the homicide for which he was on trial, rendering the evidence inadmissible. *See Commonwealth v. Green*, 76 A.3d 575, 584 (Pa. Super. 2013) (finding the res gestae exception was inapplicable to allow the prior bad acts evidence where the prior incident was over two months before the shooting in question and the prior incident was "in no way part of the same transaction or sequence of events that constituted the crime for which [a]ppellant was being tried"). Therefore, the trial court abused its discretion in admitting the prior bad acts evidence.

Because this evidence was erroneously admitted, we must next determine whether such admission is harmless. *See Commonwealth v. Bond*, 190 A.3d 664, 667 (Pa. Super. 2018) (noting "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party") (citation omitted). An error may only be considered harmless if

> (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Herring*, 271 A.3d 911, 921 (Pa. Super. 2022) (citation omitted); *see also Commonwealth v. Hamlett*, 234 A.3d 486, 492 (Pa. 2020) (stating that "sua sponte invocation of the harmless error doctrine is

not inappropriate as it does nothing more than affirm a valid judgment of sentence on an alternative basis") (citation omitted).

At trial, Perez-Escobales admitted that he shot Ayala-Maya in the back following a physical altercation between the two, but contended that he did so based on his belief that as Ayala-Maya descended the stairs, he was grabbing his pants for what Perez-Escobales believed was a gun. *See* N.T., 7/31/2024, at 390, 392-93. Dr. Ross unequivocally testified that Ayala-Maya's cause of death was the gunshot wound he sustained when Perez-Escobales shot him in the back. N.T., 7/29/2024, at 147, 150, 153.

Nieves testified that on April 12, 2020, Perez-Escobales came into her home uninvited, and proceeded to "cuss" Ayala-Maya out upon seeing him. N.T., 7/30/2024, at 194-95, 196-97. She stated that Perez-Escobales had a red bat in his hands, and that he and Ayala-May tussled. *Id.* at 197, 217. After Nieves pulled the bat from Perez-Escobales's hands, Perez-Escobales pulled out his gun. *Id.* at 197-99, 237, 277. At this time, Ayala-Maya attempted to run away down the staircase. *Id.* at 199-200. Nieves testified that Perez-Escobales immediately followed him and shot him one time. *Id.* at 201-02. Nieves stated that she did not have any knowledge of Ayala-Maya with a gun. *Id.* at 264.

Based upon our review of the record, there is no question that Perez-Escobales shot and killed Ayala-Maya; the point of contention is whether Perez-Escobales' actions constituted third-degree murder, as he raised the

justification of self-defense at trial. *See* Perez-Escobales' Brief at 29; *see also* N.T., 7/31/2024, at 487-92 (wherein the trial court instructs the jury on self-defense and imperfect self-defense).

> [T]o establish the defense of self-defense it must be shown that[:] a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying; b) that the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom; and c) the slayer did not violate any duty to retreat or to avoid the danger.

*Commonwealth v. Green*, 273 A.3d 1080, 1085 (Pa. Super. 2022) (citation and emphasis omitted). To prove a defense of imperfect self-defense, which would have supported a conviction of voluntary manslaughter and not third-degree murder, the defendant must show he held "an unreasonable rather than a reasonable belief that deadly force was required to save his or her life," and was not the aggressor and fulfilled his duty to retreat. *Id.* at 1087-88 (citation omitted); *see also* 23 Pa.C.S. § 2503(b) ("A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.").

Although Perez-Escobales testified that he believed Ayala-Maya possessed a gun at the time he shot him in the back, he presented no evidence (and makes no argument on appeal) that he fulfilled his duty to retreat.

Accordingly, the evidence established that Perez-Escobales did not act in self-defense—imperfect or otherwise.

Upon review, we conclude that the evidence of Perez-Escobales' guilt was so overwhelming that the prejudicial effect of the erroneous admission of the prior bad acts evidence were insignificant by comparison. Perez-Escobales admitted to shooting Ayala-Maya in the back, killing him. **See** N.T., 7/31/2024, at 390, 392-93; N.T., 7/29/2024, at 147, 150, 153. "Evidence that the defendant intentionally fired a gun directly at a person is sufficient to show malice" and the fact that the victim and defendant had engaged in an altercation before the shooting, "does not preclude a finding of malice." **Commonwealth v. Jones**, 271 A.3d 452, 460 (Pa. Super. 2021); **see also Commonwealth v. Jones**, 339 A.3d 493, 499 (Pa. Super. 2025) (noting for third-degree murder, "malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm") (citation and quotation marks omitted). Because the introduction of his prior bad acts evidence was harmless error, we decline to disturb the jury's verdict and conclude that Perez-Escobales' first claim does not provide him relief. **See Yocolano**, 169 A.3d at 64 ("[T]he judgment of sentence will be affirmed in spite of the error only where the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.").

- 17 -

**Discretionary Aspects of Sentencing**

Next, Perez-Escobales contends that the trial court abused its discretion in imposing an excessive sentence without properly considering his mitigating factors. Perez-Escobales' Brief at 18. Perez-Escobales challenges the discretionary aspects of his sentence. *See Commonwealth v. Watson*, 228 A.3d 928, 934-35 (Pa. Super. 2020) (stating that claims that the trial court imposed an excessive sentence and failed to properly consider mitigating factors challenges the discretionary aspects of sentencing).

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. Baker*, 311 A.3d 12, 18 (Pa. Super. 2024) (citation omitted). To invoke this Court's jurisdiction, an appellant must satisfy a four-part test:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post-sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

*Commonwealth v. Rivera*, 312 A.3d 366, 376-77 (Pa. Super. 2024) (citation and brackets omitted). A substantial question is determined on a case-by-case basis and "exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms

which underlie the sentencing process." ***Commonwealth v. McCain***, 176 A.3d 236, 240 (Pa. Super. 2017) (citation omitted).

Here, Perez-Escobales preserved his claim in a post-sentence motion and filed a timely appeal. Further, his brief contains a Pa.R.A.P. 2119(f) concise statement wherein he asserts that the trial court imposed an excessive sentence without properly considering mitigating factors. Perez-Escobales' Brief at 18. This raises a substantial question for our review. ***See Commonwealth v. Swope***, 123 A.3d 333, 339 (Pa. Super. 2015) (stating that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question") (citation omitted).

> Our standard of review of discretionary sentencing challenge is settled:
>
> Sentencing is a matter vested in the sound discretion of a sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error of judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Baker***, 311 A.3d at 19 (citation omitted).

If the trial court was informed by a presentence investigation report, "it is presumed that the court is aware of all appropriate sentencing factors and considerations, and [] where the court has been so informed, its discretion should not be disturbed." ***Commonwealth v. Miller***, 275 A.3d 530, 535 (Pa. Super. 2022); ***see also Commonwealth v. Rhoades***, 8 A.3d 912, 916 (Pa.

Super. 2010) (noting that where "the sentencing court had the benefit of a pre[]sentence investigation report, we can assume the sentencing court was aware of relevant information regarding the appellant's character and weighed those considerations along with mitigating statutory factors") (citation omitted).

Perez-Escobales contends that the trial court improperly imposed a manifestly excessive sentence. Perez-Escobales' Brief at 30. He argues that the trial court focused on the seriousness of the crime, without considering mitigating factors, such as his involvement in his son's life, his character, and his age. *Id.* at 32-34. According to Perez-Escobales, the trial court imposed the sentence it did solely because it believed that the case could have been a first-degree murder case. *Id.* at 32-33.

The record reflects that the trial court considered the presentence investigation report and sentencing guidelines with the deadly weapon enhancement. N.T., 10/7/2024, at 3, 11. The court heard about Perez-Escobales' relationship with his son. *Id.* at 5. It further heard Perez-Escobales's expression of remorse to the family of the victim. *Id.* at 8-9. The court did consider the seriousness of the crime, noting the facts could have supported a first-degree murder conviction if not for the fact only a single shot was fired, but also expressly recognized Perez-Escobales' youth, his upbringing, his lack of criminal history, and the impact of the murder on the victim's family. *Id.* at 10-12. Thereafter, the trial court imposed the sentence

of eighteen to forty years in prison on his third-degree murder conviction. **Id.** at 12.

We find no basis to conclude that the trial court abused its discretion in sentencing Perez-Escobales. Given that the trial court had the benefit of a presentence investigation report, we presume that it was aware of, and considered, all relevant sentencing factors. **See Miller**, 275 A.3d at 535. Further, as noted above, and contrary to Perez-Escobales' contention, the trial court considered various mitigating factors in fashioning his sentence. The fact that the trial court indicated the evidence could have supported a first-degree conviction if more than one shot had been fired does not establish an abuse of discretion. The sentence imposed properly reflected the court's consideration of the seriousness of Perez-Escobales's crimes and balanced that against his mitigating factors. **See Baker**, 311 A.3d at 19 (noting that "the weight accorded to the mitigating factors or aggravating factors presented to the sentencing court is within the court's exclusive domain"). Therefore, no relief is due.[2]

---

[2] Additionally, Perez-Escobales asserts that the trial court improperly considered the deadly weapon enhancement, separate from the consideration of the enhancement in calculating the offense gravity score. Perez-Escobales' Brief at 33. A claim regarding the trial court's application of the deadly weapon enhancement is a challenge to the discretionary aspects of sentencing. **Commonwealth v. Tavarez**, 174 A.3d 7, 9-10 (Pa. Super. 2017). Perez-Escobales did not raise this claim in his post-sentence motion or at sentencing. Thus, it is waived. **See Commonwealth v. Cartrette**, 83 A.3d 1030, 1042 (Pa. Super. 2013) (holding that a discretionary aspects of a sentence
*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/21/2025

---

challenge must be raised at sentencing or in a post-sentence motion or the claim is waived).  Nevertheless, we observe that the court's only mention of the deadly weapon enhancement was noting "the guidelines are strong with the deadly weapon enhancement, but it is appropriate in this case."  N.T., 10/7/2024, at 12.  There is no indication in the record that the trial court counted the enhancement twice in imposing the sentence.