J-S42039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RAHEEM GREEN | : | |
| | : | |
| Appellant | : | No. 179 MDA 2025 |

Appeal from the Judgment of Sentence Entered January 17, 2025
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0002219-2023

BEFORE: OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED: JANUARY 21, 2026**

Raheem Green ("Green") appeals from the judgment of sentence imposed following his convictions for strangulation and simple assault.[1] We affirm.

We glean the following facts from the testimony and evidence presented at trial. In 2023, Officer Evan McKenna ("Officer McKenna") and another officer responded to a 911 call outside of an apartment building in Harrisburg, Pennsylvania, based on a report that a "male and female [were] arguing and someone saying they . . . had been choked." N.T., 10/29/24, at 112. After arriving on the scene, Officer McKenna observed a visibly injured Katherine Osorio ("Osorio"), who "appeared to be extremely intoxicated [and] had urinated on herself," arguing and fighting with her sister at the bottom of a

---

[1] *See* 18 Pa.C.S.A. §§ 2718(a)(1), 2701(a)(1).

set of metal stairs leading up to an apartment residence. Upon breaking up the physical altercation, the officers inquired into Osorio's injuries, which consisted of "bruising [and abrasions] on her neck [and] above her eye[.]" *Id*. at 117, 136-38. In response, Osorio told police that her boyfriend of one and one-half years, Green, had strangled her and "threw her into [a bath]tub" during the birthday party taking place in the upstairs apartment. *Id*. at 110. While Osorio additionally told police that she was mad at Green "for leaving her at the party[,]" she did not mention any other cause for her injuries. *Id*. at 111. Additionally, neither Osorio's sister nor any of the other partygoers approached police to tell them that Osorio "had [instead] injured them or assaulted them[.]" *Id*. at 112, 116.

After giving the above statement to police, an ambulance arrived and transported Osorio to a hospital for treatment of her injuries. Relevantly, while she was in the emergency room ("ER"), Osorio reported to the triage nurse that: (1) she had "rib pain[;]" (2) "it hurt[] to breathe[;]" and (3) she suffered a "loss of consciousness after being choked." *Id*. at 136.[2] When the hospital administered an abuse screening as a result of this report, Osorio additionally responded "that she feels safe in her home but not safe in her relationship." *Id*. at 138. Police thereafter arrested Green, and the Commonwealth charged him with strangulation and simple assault.

---

[2] A "CAT scan" of Osorio's chest revealed that she had "a severely displaced fracture of . . . her right seventh rib." N.T., 10/29/24, at 150.

- 2 -

Following multiple continuances, the matter proceeded to a jury trial, during which the Commonwealth presented evidence in the form of a recording of both the 911 call and the police body-worn camera footage from the night of the incident, as well as a prison phone call between Green and his cousin following Green's arrest. The Commonwealth additionally presented testimony from Osorio, Detective Shawki Lacey ("Detective Lacey"), Officer McKenna, and Osorio's ER physician, Doctor Andrea Tydir ("Doctor Tydir"), who the trial court qualified as an expert in diagnosing and treating traumatic injuries.

Notably, when the Commonwealth called Osorio as a witness, she relayed a sequence of events which differed from what she told police and hospital staff on the night of the incident. In doing so, Osorio testified that while she was attending the birthday party with Green, she was "[v]ery belligerent and high" due to her consumption of an ecstasy pill and multiple forms of alcohol, and that this had resulted in her "cussing[,]" disrespecting other guests, and "acting in those ways of taking the party down[.]" *Id*. at 80-81. Osorio explained that although Green was initially "just kind of cheering [this behavior] on[,]" he eventually led her into the bathroom to tell her that they should leave the party, as her behavior was concerning to him and "something he's never seen before." *Id*. at 81. Despite Osorio's testimony that she was "in and out of consciousness" at the time, she recalled that Green's attempts to get her to leave the party "triggered [her] to get . .

. real angry[,]" to the extent that she "slapped" his phone out of his hand and started "punching [and] kicking" such that she was "like beating him up [and] putting [her] hands on him." *Id*. at 81, 83.[3] Osorio insisted that Green did not fight back in response to these attacks, but instead managed to escape from the bathroom and leave the party without her. Osorio then stated that when she then attempted to follow Green out of the apartment, she was "irate[,]" "hitting [her] head on walls[,]" and bumping into people and objects alike. *Id*. at 85. Osorio clarified that by the time she finally managed to reach the exit to the apartment, her inebriated and angered state caused her to fall down the outside metal staircase. *Id*. at 86.

Upon reaching the bottom of the stairs, Osorio explained that she asked her sister to call 911. Although Osorio initially claimed that she could not remember what she and her sister said during this phone call, she conceded that it was her on the 911 recording who was "[t]he person who says, I've been assaulted[.]" *Id*. at 55. Osorio additionally testified that at some point prior to police arriving on the scene, she and her sister got into "a big, big fight[,]" such that they were "punching, kicking, [body slamming, pulling hair,

---

[3] At trial, both parties stipulated to the fact that Green "did not have to be medically cleared and did not have any visible injuries [thirty-six] hours after the incident in this case." N.T., 10/29/24, at 118-19.

and] everything you can think of being in a really big fight." *Id*. at 56, 86.[4]

Osorio submitted that this fight ensued in part due to the fact that her sister "wouldn't let [her] pull [her] pants down" to urinate in the alleyway, and that she had defiantly squatted down and urinated in her pants, regardless. *Id*. at 57. Finaly, Osorio admitted to telling police that Green had strangled her the night of the incident, but maintained that she could not remember if she said the same to the ER triage nurse.[5]

Following Osorio's testimony, Officer McKenna provided a contrasting narrative, as we summarized above. In doing so, however, Officer McKenna additionally opined, in his capacity as a lay witness and over Green's objection, that Osorio's injuries and symptoms were consistent with that of strangulation. Specifically, Officer McKenna stated that based on his five years of employment with the Harrisburg Police Department, and his having

---

[4] Although Osorio initially claimed that this fight took place following the 911 call, she later testified that it instead took place just before, and that the recording of the 911 call captured some of the resulting commotion. *See* N.T., 10/29/24, at 56, 77, 86.

[5] We note that following Osorio's testimony, the Commonwealth called Detective Lacey, a qualified expert from the Criminal Investigation Division, to assist with the interpretation of a pretrial recorded prison phone call between Green and his cousin, in which the Commonwealth alleged Green had told his cousin via coded language to threaten Osorio to provide false testimony at trial. During the phone call, Green told his cousin that he needed his "muscle" and "someone that's strong-minded, who knows how to swing a fishing pole, bam bam[,]" to get in touch with and send a message to Osorio. N.T., 10/29/24, at 101. Detective Lacey opined that Green's usage of the term "fishing pole" in this context was likely in reference "to a firearm." *Id*.

responded to multiple domestic violence cases involving strangulation during that time, he believed that: (1) urinating oneself can be a sign of strangulation; and (2) Osorio's "bruising on her neck [was] consistent with strangulation." *Id*. at 116-17.[6] Notably, the Commonwealth thereafter presented the expert testimony of Doctor Tydir, who confirmed Officer McKenna's belief that Osorio's injuries were the result of strangulation. Specifically, Doctor Tydir testified that based on her review of Osorio's patient history, which noted Osorio's report to the hospital triage nurse that she had been strangled, and Doctor Tydir's visual identification of "very specific" red marks on Osorio's neck that she explained are "only seen in cases of strangulation[,]" her clinical impression was that Osorio's injuries were caused by "[a]ssault by manual strangulation[.]" *Id*. at 164, 166.

Green subsequently presented the testimony of Franklin Williams ("Williams"), his cousin and a witness to the events at the party that evening, before testifying himself. Relevantly, Williams testified that he witnessed Green and Osorio enter into the bathroom during the party, and that while they were in there, Osorio "went crazy[.]" *Id*. at 177. Williams elaborated that because the bathroom door was open at the time, he was able to see Osorio "yelling, screaming, [and] punching" Green, who "was [in turn] just in

---

[6] On cross-examination, Officer McKenna conceded that another "common reason that someone might urinate on themselves" would be extreme intoxication. N.T., 10/29/24, at 114.

there screaming . . . with his hands up" and telling her to get off of him. *Id*. at 177-78. Green then testified, *inter alia*, that: (1) he asked Osorio to go into the bathroom with him so that he could calm her down; (2) while they were in the bathroom he tried to take a video of her with his cell phone, but had to stop because he "didn't want her to throw [his] phone in the toilet[;]" (3) when he stopped recording and attempted to leave, Osorio "started hitting [him] on the back of" his head, and eventually hit him "with [a clay/ceramic] item from [the] bathroom sink[,]" which caused his ear to swell up; (4) he never strangled, hit, or put his hands on Osorio while they were in the bathroom; and (5) he never instructed anyone afterwards to either prevent Osorio from appearing at trial or force her to lie about what happened. *Id*. at 183-85. Additionally, while Green conceded that "people do use the word pole" to refer to a gun, he insisted that "a fishing pole is not a gun[,]" and that he instead used the term to instruct his cousin to reach out to Osorio regarding the status of his and Osorio's relationship following the party. *Id*. at 186-87. Similarly, Green clarified that he "never said bam bam" during the phone call, and that he instead "said, wam wam[,] which means quick, fast, and hurry." *Id*. at 187.

At the conclusion of the trial, a jury convicted Green of both strangulation and simple assault. On January 17, 2025, following the preparation of a presentence investigation report, the trial court imposed an aggregate sentence of four and one-half to nine years' imprisonment. Green

did not file a post-sentence motion, but instead filed a timely notice of appeal, whereupon both he and the trial court complied with Pa.R.A.P. 1925.

Green raises the following issue for our review: "Did the trial court err when it allowed the investigating officer to testify as to the medical symptoms and causation, as well as diagnosis of the injuries of the victim, when his testimony constituted expert testimony which the officer was not qualified for?" Green's Brief at 4 (unnecessary capitalization omitted).

Green's sole issue challenges the admissibility of evidence at trial. We review a trial court's evidentiary rulings to determine whether the court abused its discretion. *See Commonwealth v. Smith*, 325 A.3d 513, 518 (Pa. 2024). "An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality." *Id*. at 519.

Relevantly, a witness may offer lay testimony in the form of an opinion if it is: (a) rationally based on the witness' perception; (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge. *See* Pa.R.E. 701(a)-(c). By contrast, an expert must testify in relation to evidence that requires explanation via "scientific, technical, or other specialized knowledge . . . beyond that possessed by the average layperson." Pa.R.E. 702(a).

Although our appellate courts have not directly addressed whether a party must produce an expert witness to testify to the physical processes accompanying **manual** strangulation, as is the case here, our Supreme Court has instructed that such testimony is required to explain those physical processes accompanying **ligature** strangulation. **See Commonwealth v. Lopez**, 854 A.2d 465, 470 (Pa. 2004) (explaining "[t]he average layperson is generally unacquainted with the physical processes accompanying ligature strangulation"). Accordingly, this Court has since required an expert to testify in response to questions of whether a victim's injuries were the result of ligature strangulation. **See Commonwealth v. Yocolano**, 169 A.3d 47, 63 (Pa. Super. 2017) (holding that the trial court erred by permitting the Commonwealth to ask a doctor and nurse, who were both testifying in their capacities as lay witnesses, about whether the victim's bruising on her ankles and wrists was consistent with her account of being forcibly bound, as "[t]hese conclusions required causation expertise[,] and there was no proffered evidence that [either witness] regularly examined ligature and strangulation marks[,] or had scientific knowledge on the subject").

In the event that this Court determines that the trial court abused its discretion by improperly admitting expert testimony into evidence via a lay witness, our courts have consistently held that an appellant is only due relief if the admission does not constitute "harmless error." **Commonwealth v. Hairston**, 84 A.3d 657, 671 (Pa. 2014). "The harmless error doctrine, as

adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Id*. (citation omitted). As our Supreme Court has explained:

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) **the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence**; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id*. at 671–72 (citation omitted and emphasis added).

Green argues that the Commonwealth improperly elicited expert testimony from Officer McKenna when it asked him to expound on "the symptoms of strangulation and whether [Osorio]'s injuries were consistent with strangulation." Green's Brief at 10. Green maintains that because Officer McKenna was testifying in his capacity as a police officer experienced in law enforcement, he was not inherently qualified to testify as it relates to "medical symptoms and diagnoses." *Id*. Instead, Green contends that the Commonwealth could only present this evidence via the testimony of a medical expert.

In support, Green relies on **Cominsky v. Donovan**, 846 A.2d 1256, 1257 (Pa. Super. 2004), in which he asserts that this Court ruled the trial court erred by allowing a comatose woman's adult children to testify, in their capacity as lay witnesses, that she "felt pain in a persistent vegetative state."

*Id*. at 12.  Green asserts that just as this Court held that the adult children in

***Cominsky*** did not have "the required medical knowledge to discuss the pain

suffered by the[ir] mother[,]" Officer McKenna did not have the requisite

medical knowledge to discuss "whether urination or the injuries [that Osorio]

suffered were caused by strangulation . . . to a degree of medical certainty."

*Id*. at 13.  Accordingly, Green avers that because Officer McKenna's testimony

"was in essence a[n unqualified] diagnostic and medical opinion" given without

"a reasonable degree of scientific certainty[,]" it constituted inadmissible

testimony requiring the grant of a new trial.  ***Id***. at 14.

Lastly, Green argues that "the Commonwealth cannot meet its burden

to []prove harmless error[,]" as he contends that Officer McKenna's testimony

was not cumulative with respect to Doctor Tydir's diagnosis of strangulation,

as it instead "served to gloss over and bolster" the doctor's conclusions.  ***Id***.

at 15.  Further, Green insists that "the evidence was not so overwhelming to

establish guilt[,]" given that Osorio "testified that there was no altercation and

[that] she was incorrect in her earlier statements."  ***Id***.  Consequently, Green

maintains that because Officer McKenna's improper assessment as to the

cause of Osorio's injuries partially resolved the "battle of which testimony

should have been believed[,]" he asserts that "a new trial is necessary."  ***Id***.

The trial court considered Green's issue and determined that it was

without merit, reasoning as follows:

> In the instant matter, Officer McKenna was a witness for the
> Commonwealth.  He is a police officer with the Harrisburg Police

- 11 -

Department and has been working the midnight shift for approximately five years. He testified that he has responded to numerous domestic incidents over the five years that he has worked as a police officer. He received a 911 call on March 25, 2023 stating that a male and female were arguing, and someone said that they had been choked. He went to the address mentioned in the 911 call and spoke with [Osorio,] the alleged victim. [Osorio] reported that her boyfriend had strangled her and thrown her into a bathtub.

Upon cross[-]examination, Officer McKenna noted [Osorio] urinated on herself. He also acknowledged that a common reason that someone might urinate on themselves is because of extreme intoxication. Thereafter, on re-direct, and over [Green]'s objection, Officer McKenna was asked if, in his experience dealing with strangulation cases, urinating on yourself was a sign of strangulation. Officer McKenna said yes to this question. Also[,] over [Green]'s objection, Officer McKenna was asked if [Osorio's] injuries matched what she had reported as happening. Officer McKenna testified that [Osorio] had bruising on her neck, which is consistent with strangulation.

Upon review of Officer McKenna's testimony, we find that he did not provide expert testimony. Rather, he provided permissible lay opinion testimony that was based on his experience as a police officer who has previously responded to strangulation cases. Officer McKenna testified that, in his experience, urinating oneself can be a sign of both extreme intoxication and strangulation. This is permissible lay testimony because it is based on facts within his knowledge, specifically what he has personally observed in other instances involving strangulation.

His testimony was also rationally based on his perception of [Osorio]'s injuries and her report of what occurred on the night in question. It does not require scientific[,] technical[,] or other specialized knowledge to recognize that a bruised neck is consistent with strangulation. Thus[,] it was permissible lay testimony for Officer McKenna to opine that [Osorio]'s bruised neck was consistent with strangulation.

Trial Court Opinion, 4/24/25, at unnumbered 2-3 (citations omitted).

In the instant case, we preliminarily determine that we need not address whether the trial court abused its discretion by admitting Officer McKenna's at-issue testimony into evidence, as we deem that any such error would have nonetheless been harmless. In doing so, we recognize that we are side-stepping the unexplored issue of whether the physical processes behind manual strangulation are so distinct from those associated with ligature strangulation that a separate analysis is required to determine whether they are within the general understanding of the average layperson. However, in reviewing the briefs submitted by both parties, we note that neither side cites to any authority, either persuasive or controlling, to advance an argument that directly answers this question.[7] Consequently, although this panel is inclined to agree with the trial court in this instance — that the average layperson generally understands the physical processes associated with manual strangulation to the extent that bruising might result from its occurrence — we do not believe that this case offers the proper venue to make such a distinguishable ruling. Accordingly, we limit our analysis herein to determining whether any error made by the trial court in this regard was nonetheless harmless.

---

[7] Although Green cites to **Yocolano** in his appellate brief, he only does so to establish that "[e]xpert testimony must be based on reasonable degrees of certainty." Green's Brief at 11.

Here, we observe that Officer McKenna's potentially impermissible testimony, that Osorio's neck bruising was a result of strangulation and that her urination could be a symptom of said strangulation, went towards proving the Commonwealth's theory that Osorio had been strangled on the night of the incident. Notably, however, this was not the only evidence that the Commonwealth presented at trial in support of this fact. We highlight the Commonwealth additionally presented both the 911 call, in which Osorio identified herself as "[t]he person who says, I've been assaulted[,]" as well as police body-worn camera footage which captured a visibly injured Osorio stating to police that Green had strangled her and "threw her into [a bath]tub" during the birthday party taking place in the upstairs apartment. N.T., 10/29/24, at 55, 110.

Crucially, the Commonwealth also presented testimony from Doctor Tydir, Osorio's treating ER physician and a qualified expert in diagnosing and treating traumatic injuries, who professionally opined that Osorio's injuries were consistent with "[a]ssault by manual strangulation[.]" *Id*. at 164. In forming this medical opinion, Doctor Tydir explained that she relied on her review of Osorio's patient history, which noted Osorio's report to the triage nurse that she had been strangled, as well as Doctor Tydir's visual identification of "very specific" red marks on Osorio's neck, which she explained are "only seen in cases of strangulation[.]" *Id*. at 166.

Given the existence of the above substantially similar, untainted evidence that the Commonwealth provided to support a finding that Osorio had been strangled, we discern that Officer McKenna's testimony in this regard was "merely cumulative" to other admissible evidence. Thus, any error made by the trial court in admitting Officer McKenna's testimony into evidence was harmless. *See Hairston*, 84 A.3d at 671. Consequently, because we determine that Green's sole issue on appeal does not merit relief, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judge King joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 01/21/2026

- 15 -